Richard D. McCune (State Bar No. 132124)
rdm@mccunewright.com
Steven A. Haskins (State Bar No. 238865)
sah@mccunewright.com
Valerie L. Savran (State Bar No. 334190)
vls@mccunewright.com
**MCCUNE LAW GROUP, APC**
3281 E. Guasti Road, Suite 100
Ontario, California 91761
Telephone:  (909) 557-1250
Facsimile:   (909) 557 1275

Emily J. Kirk (IL Bar No. 6275282)*
ejk@mccunewright.com
**MCCUNE LAW GROUP, APC**
231 N. Main Street, Suite 20
Edwardsville, IL 62025
Telephone: (618) 307-6116
Facsimile: (618) 307-6161

*Pro Hac Vice* application to be submitted

Attorneys for Plaintiffs Andrew Penuela,
Koushik Charan, Jill Molaris, Maria
Smythe, Jessica Willshire, and Daymond
Walton and the Putative Class

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW PENUELA, KOUSHIK CHARAN, JILL MOLARIS, MARIA SMYTHE, JESSICA WILLSHIRE, and DAYMOND WALTON individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO BANK, N.A., WELLS FARGO & CO, and DOES 1 through 5, inclusive,<br><br>Defendants. | Case No. 4:24-cv-00766<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>1. Violation of the Electronic Fund Transfer Act (Regulation E, 12 C.F.R. §§ 1005, *et seq*.)<br>2. Violation of the California Unfair Competition Law (Bus. & Prof. Code § 17200, *et seq*.)<br>3. Breach of Contract<br>4. Breach of the Implied Covenant of Good Faith and Fair Dealing<br>5. Unjust Enrichment<br>6. Money Had and Received<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

1

# I    INTRODUCTION

2    1.    Andrew Penuela, Koushik Charan, Jill Molaris, Maria Smythe, Jessica

3    Willshire, and Daymond Walton ("Plaintiffs") bring this lawsuit against Wells Fargo &

4    Company and Wells Fargo Bank, N.A. (collectively, "Wells Fargo" or "Defendant") on

5    behalf of Wells Fargo customers, on the basis that it has violated Federal Reserve

6    Regulation E, 12 C.F.R. § 1005.1, *et seq*. ("Reg E" or "Regulation E"). Regulation E

7    requires that before financial institutions may charge overdraft fees on one-time debit

8    card and ATM transactions, they must provide customers with a complete, clear, and

9    easily understandable disclosure document accurately describing their overdraft services

10    (opt-in disclosure agreement); the disclosure document must be substantially similar to

11    Regulation E Model Form A9 and presented to customers as a stand-alone document not

12    intertwined with other disclosures; and they must obtain verifiable agreement (affirmative

13    consent) of a customer's agreement to opt-in to the financial institution's overdraft

14    program, regardless of the method of opt-in (i.e., in person at a branch, online, or by

15    phone).

16    2.    Through May 2022, Wells Fargo attempted to comply with Regulation E by

17    providing customers with a Regulation E opt-in disclosure agreement describing the

18    bank's debit card overdraft service ("DCOS"), called "*What You Need to Know About*

19    *Overdrafts and Overdraft Fees*" (emphasis in original).[1] Unfortunately, the document

20    used ambiguous and misleading language to describe when Wells Fargo charged

21    overdraft fees. Specifically, it suggested that Wells Fargo charged overdraft fees based on

22    the actual, official account balance instead of the artificial "available balance" Wells

23    Fargo uses as an internal accounting measure. Wells Fargo also provided these

24    disclosures as part of an eight-page brochure with other marketing agreements and

25

26

27

28

---

[1] *See* Wells Fargo Bank's opt-in disclosure agreement titled "*What You Need to Know About Overdrafts and Overdraft Fees.*" attached hereto as **Exhibit A** (emphasis in original).

-1-

First Amended Class Action Complaint
Case No. 4:24-cv-00766

disclosures. As such, it failed to present the opt-in disclosure agreement separate from other disclosures as Regulation E requires. 12 C.F.R. 1005.17, cmt. 17(b)-6.

3.      Because Regulation E prevents banks from charging any overdraft fees on one-time debit card and ATM transactions without first obtaining affirmative consent based on a proper and accurate disclosure of its overdraft practices as presented in a stand-alone opt-in disclosure agreement using proper opt-in procedures, Wells Fargo's assessment of all overdraft fees on one-time debit card and ATM transactions against customers who were opted-in prior to May 2022 has been and continues to be illegal.

4.      In addition to utilizing a nonconforming opt-in disclosure agreement through May of 2022, Wells Fargo continues to violate Regulation E in other ways. Regulation E requires that customers have a reasonable opportunity to affirmatively consent before a financial institution can assess overdraft fees on one-time debit card and ATM transactions, regardless of the method of opt-in. 12 C.F.R. 1005.17(b)(iii). Such consent must be given by a customer's signature on the opt-in disclosure agreement, or some affirmative action by the customer, such as clicking a button. 12 C.F.R. 1005.17, cmt. 17(b)-4. Instead, Wells Fargo instructed employees to verbally summarize the terms of its Regulation E overdraft program and if the customer said yes based on the unscripted, verbal description, the employee would opt-in the customer. This practice violates Regulation E. Moreover, there is evidence that Wells Fargo is charging customers overdraft fees on ATM transactions without opting-in customers to its Regulation E overdraft program, which also violates Regulation E.

5.      The Consumer Financial Protection Bureau ("CFPB") has found Wells Fargo's method of opting-in customers non-conforming in the context of at least one other bank,[2] and multiple courts have found with the same practice at other banks that at the very least it raises triable issues of fact for the jury to decide.

---

[2] *See* **Exhibit B**, Atlantic Union Bank; CFPB Consent Order at 10-12.

First Amended Class Action Complaint
Case No. 4:24-cv-00766

6.    In addition to Regulation E, Wells Fargo has engaged in other unfair fee practices and breached its relevant contracts and disclosures by assessing overdraft fees when a transaction is authorized on a positive balance but later settles with a negative balance, known as Authorize Positive Settle Negative ("APSN"), as well as assessing multiple fees on the same returned item ("representment fees"). Such fee practices have been declared unfair by numerous regulatory agencies, even when they are properly disclosed to consumers.

7.    Wells Fargo has even entered into a consent decree with the CFPB in which it has acknowledged that it improperly charged overdraft fees on APSN transactions, which is one of the very claims alleged here.[3]

8.    Wells Fargo's practices cap a long and documented history of troubling overdraft practices, rendering intervention all the more necessary. Included in that history are a trial court's findings that Wells Fargo had engaged in gouging and profiteering in its overdraft practices, and then misled customers about it. The Ninth Circuit Court of Appeal, in affirming a $203 million judgment against Wells Fargo, let stand the finding that Wells Fargo had misrepresented its overdraft practices (the practice at issue in that case was the order of processing the transactions to increase overdraft fees instead of the current use of an artificial balance to increase overdraft fees), and let stand an injunction prohibiting Wells Fargo from further misrepresenting how it processed transactions related to its overdraft services.

9.    Despite Wells Fargo's Regulation E and other fee violations which affect thousands of its customers, customers cannot initiate lawsuits—either individually or for class action relief—supposedly because Wells Fargo inserted into its Account Agreement an arbitration clause purportedly requiring Claimants to resolve disputes through an individual, bilateral arbitration process. To prevent consumers from obtaining their day in court, Wells Fargo relies on language it uses in its adhesive Account Agreement to

---

[3] **Exhibit C,** CFPB Consent Order, December 20, 2022 at 15.

First Amended Class Action Complaint
Case No. 4:24-cv-00766

induce Plaintiffs to agree to arbitration. According to the Account Agreement, consumers are told that "an impartial third party will hear the dispute between Wells Fargo and provide a decision,"[4] referring them to the AAA Consumer Rules. In those rules, AAA makes similar claims, stating that "the [AAA] founded in 1926, **is a neutral, independent, and private not-for-profit organization**."[5]

10.    The statements Wells Fargo and AAA have made to induce consumers to accept arbitration are false. AAA is not impartial, neutral or independent as it relates to consumer claims against banks. As a "not-for-profit organization," it is directed and controlled by a Council of 80 voting members.[6] A majority of these council members are members of law firms that represent financial institutions, and many represent Wells Fargo specifically. Conversely, despite AAA's supposed neutrality and independence, not a single member of the Council comes from a consumer advocacy group or a law firm that represents consumers against banks. AAA's claims to "neutrality" and "impartiality" are pretextual.

11.    The reason AAA tilts the scales against consumers is simple, and naturally flows from the unequal process through which arbitration commences in the consumer context. Unlike mediation, which must be administered by a mediator acceptable to both parties, AAA is unilaterally chosen by the party drafting the adhesive contract; in this case, Wells Fargo. To that end, Wells Fargo is the customer, and if AAA is not designated to perform Wells Fargo's arbitrations, AAA loses revenue.[7] So, it does not

---

[4] *See* **Exhibit D,** Wells Fargo Deposit Account Agreement at 35.
[5] *See* **Exhibit E**, AAA Consumer Arbitration Rules at 7.
[6] *See* **Exhibit. F**, 2022 Annual Report and Financial Statements at 10.
[7] The relationship between AAA and its large corporate clients is reminiscent of the collusive relationship between Wall Street bond traders and the bond ratings agencies in the run-up to the subprime mortgage collapse of 2008. In order to sell securitized mortgages as "safe," Wall Street firms needed to obtain a top rating (ironically, "AAA") from one of the three national firms recognized for rating bonds, S&P, Moody's, or Fitch. But the rating agencies were paid by the Wall Street firms, who would simply take their business to another rating agency if the chosen agency was uncooperative. These circumstances produced a race to the bottom: The ratings agencies issued glowing AAA ratings to increasingly risky mortgages until the inevitable crash, and subsequent crisis of consequence, threatened the entire financial industry.

First Amended Class Action Complaint
Case No. 4:24-cv-00766

matter what the consumer thinks about the process or results – they are stuck with AAA to decide all of their disputes with Wells Fargo.  Conversely, if Wells Fargo does not like the process or results, with a keystroke Wells Fargo can change its Account Agreement to designate a different arbitration association to hear claims against it and AAA would lose out on all future Wells Fargo business.  It is no wonder that AAA is set up with law firms representing banks generally and Wells Fargo specifically – it is the lifeblood of its consumer practice revenue.

12.    Plaintiffs and thousands of other customers attempted to follow the arbitration procedure Wells Fargo set forth in the Account Agreement. But given the cozy pre-existing relationship between AAA and Wells Fargo, these consumers did not get the quick and efficient individualized process Wells Fargo promised. Instead, AAA, at Wells Fargo's encouragement, involuntarily herded these claimants into a "mass arbitration," in violation of the Account Agreement's promise of bilateral arbitration. The mass approach stalled the process, with many Claimants' cases halted for almost two years, while an appointed "process arbitrator" imposed onerous pleading requirements (well beyond what is even required in federal court) on the mass of cases.  Even those Claimants who met the process arbitrator's purported pleading requirements were not permitted to move on to the merits portion of the arbitration process until all Claimants submitted information attempting to meet the process arbitrator's standards.

13.    Each named Plaintiff in this case served a demand to AAA as required by the Account Agreement, assuming that they would get the individual, bilateral arbitration promised.  Instead, they found themselves swept up in a mass action in which the success or failure of their claims moving forward was tied to the claims of thousands of other Wells Fargo accountholders. What is more, Plaintiffs' claims were dismissed by a "process arbitrator" not on their merits, but because they could not satisfy the process arbitrator's enhanced pleading standard requiring all "mass arbitration" participants to submit the evidence supporting their claims before AAA would assign an arbitrator. This arbitrary pleading standard is found nowhere in law or arbitration rules. It is an invention

First Amended Class Action Complaint
Case No. 4:24-cv-00766

to facilitate Wells Fargo's ability to avoid litigation. Even worse, the evidence that the process arbitrator was requiring Claimants to provide was in Wells Fargo's sole possession, custody, and control, and not the Claimants'. However, for years Wells Fargo has continued to thwart Plaintiffs' reasonable information requests to obtain this "evidence," which has left Plaintiffs and thousands of others like them unable to move forward in arbitration. This process has added years to each individual's arbitration, and only recently did the process arbitrator declare that some claims could proceed, but thousands of others (including Plaintiffs') could not.

14.    Having been shut out of the arbitration process, Plaintiffs now bring this class action lawsuit for relief because they have been left with no forum in which to have their claims heard.

## II    NATURE OF THE ACTION

15.    Plaintiffs have brought this class and representative action to assert claims in their own right, as the class representatives of all other persons similarly situated, as well as members of the public. Regulation E requires Wells Fargo to obtain informed consent, by way of a written stand-alone document that fully and accurately describes in an easily understandable way its overdraft services, before charging accountholders an overdraft fee on one-time debit card and ATM transactions. Because of the substantial harm to customers caused by significant overdraft fees on relatively small debit card and ATM transactions, Regulation E requires financial institutions to put all pertinent overdraft information in one easily understood document. Financial institutions may not circumvent this requirement by referencing, or relying on, their account agreements, disclosures, or marketing materials. Regulation E expressly requires a financial institution to include all the relevant terms of its overdraft program within the four corners of the document, creating a separate agreement with accountholders regarding overdraft policies. Regulation E's opt-in requirements must be met, regardless of the means by which opt-in occurs.

First Amended Class Action Complaint
Case No. 4:24-cv-00766

16.     Through May of 2022, Wells Fargo failed to satisfy Regulation E's express requirements. Instead, it used an opt-in disclosure agreement that misleadingly and/or ambiguously described the circumstances in which it charged overdraft fees on paid transactions. Specifically, it defined an overdraft as occurring any time there was *not enough money* in the account to pay the transaction, *but Wells Fargo pays it anyway*.

17.     Though Wells Fargo was using these written disclosures, its automated decisions to assess overdraft fees were not based on whether there was enough money in the actual account balance to pay the transaction. Instead, it calculated account balances for overdraft purposes using an artificially reduced calculation called the "available balance," which deducts money Wells Fargo unilaterally decides should be held for future transactions. When these future holds are accounted for, the calculation often results in a negative "available balance" existing only on paper, even though money in the account exists at the time of payment and posting to cover the transaction without creating a true negative account balance. Its failure to disclose in its opt-in disclosure agreement its true practice of charging overdraft fees based upon the available balance violated Regulation E. Accordingly, Wells Fargo's opt-in disclosure agreement not only failed to accurately disclose the balance it used to assess an overdraft fee (failing to disclose in a clear and understandable way is itself all that is required for a Reg E violation), it misrepresented Wells Fargo's overdraft policies.

18.     The CFPB agrees. It recently counseled that the practice of charging overdraft fees on transactions when consumers have sufficient funds constitutes an unfair practice, because "even if a consumer closely monitors their account balances and carefully calibrates their spending in accordance with the balances shown, they can easily incur an overdraft fee they could not reasonably anticipate because financial institutions use processes unintelligible for many consumers and that consumers cannot control."[8] As the CFPB has made clear, such unfair overdraft fees often occur when financial

---

[8] *See* CFPB Circular, *Unanticipated Overdraft Fee Assessment Practices,* October 26, 2022, available at (consumerfinance.gov).

First Amended Class Action Complaint
Case No. 4:24-cv-00766

institutions "use one kind of balance over another for fee calculation purposes," and that this practice is unfair because it causes substantial harm to consumers, even though "institutions may provide disclosures related to their…overdraft assessment policies."[9] As such, Wells Fargo's practice of utilizing the available balance method to assess overdraft fees to consumers is unfair because it causes additional fees on transactions that the consumer would not expect to incur a fee, and thus cannot reasonably avoid, regardless of the fact this practice is now disclosed.

19.    Through May of 2022, Wells Fargo also failed to provide its opt-in disclosure agreement as a stand-alone form, segregated from all other information, as required under Regulation E. 12 C.F.R. 1005.17(b)(1)(i). Instead, it provided the opt-in disclosure agreement as part of an eight-page brochure with other marketing statements and disclosures. Given this, Wells Fargo could not have obtained consumers' affirmative consent because it was not following Regulation E's specified opt-in enrollment procedure. During enrollment, Wells Fargo also failed to (1) obtain consumers' affirmative consent separate from all other acknowledgements and (2) provide consumers with written confirmation of enrollment and information about the right to revoke that enrollment. Moreover, Wells Fargo instructed its employees to verbally describe the terms of DCOS to new customers rather than have them read the form for themselves as required. Then if the customers agreed following the verbal description, Wells Fargo employees would opt them into the program. But this does not meet Regulation E standards. Instead, Regulation E mandates that consumers be presented with the opt-in disclosure agreement and then affirmatively consent by signing a form or clicking a button (or some similar affirmative action) prior to being assessed overdraft fees on one-time debit card and ATM transactions, regardless of the method of opt-in. 12 C.F.R. 1005.17, cmt. 17(b)-4. By enrolling customers in this way, Wells Fargo fails to obtain affirmative consent. 12 C.F.R. 1005.17(b)(1)(ii). Furthermore, there is evidence that

---

[9] *Id.*

First Amended Class Action Complaint
Case No. 4:24-cv-00766

Wells Fargo charges non-opted in customers overdraft fees on ATM transactions which is a direct and blatant Regulation E violation in and of itself.

20.    Wells Fargo has also engaged in other unfair fee practices, including assessing overdraft fees on APSN transactions, as well as assessing representment fees when the same item is presented for payment multiple times by a merchant through no other action of the consumer. Both the CFPB and the Federal Deposit Insurance Corporation ("FDIC") have recently issued supervisory guidance that such fees cause substantial harm to consumers and are not outweighed by any countervailing benefits. In addition to being unfair, such practices also violate Wells Fargo's contracts and disclosures. Although its Account Agreement authorizes Wells Fargo to charge a single non-sufficient funds ("NSF") fee when it returns a transaction item unpaid, it does not permit Wells Fargo to assess a second or third NSF or overdraft fee if a merchant represents that item again for payment, yet Wells Fargo charges the additional fee(s) anyway.[10]  In addition, Wells Fargo's Account Agreement discloses that an overdraft fee may be assessed when an account lacks a sufficient available balance at the time of the transaction.[11] However, in the case of APSN transactions, at the time the consumer initiates the transaction and Wells Fargo authorizes it, the consumer has a positive available balance so there should be no overdraft fee.  But if the consumer's account balance goes negative before that transaction posts, Wells Fargo assesses an overdraft fee anyway in violation of its contract terms.  A consumer would have no way to know or

---

[10] *See* **Ex. G,** Wells Fargo Deposit Account Agreement, November 9, 2020 at 30 (stating that if a consumer does not have enough money in the account, "We will return your checks and automatic payments (such as ACH payments) and assess *a returned item fee* (non-sufficient funds/NSF)…") (emphasis added).

[11] *Id.* at 26 (stating that "if your account has *insufficient funds as reflected by your available balance,* the Bank may assess overdraft and/or non-sufficient funds (NSF) fees") (emphasis added); *see also* p. 29 (stating that "Debit Card Overdraft Service allows Wells Fargo to approve (at our discretion) your ATM and everyday (one-time) debit card transaction(s) *if you do not have enough money in your checking account or in accounts linked for Overdraft Protection at the time of the transaction*") (emphasis added).

-9-

First Amended Class Action Complaint
Case No. 4:24-cv-00766

anticipate from Wells Fargo's contracts that they would incur an overdraft fee when a transaction is authorized on a positive available balance. Accordingly, this fee practice also violates Wells Fargo's Account Agreement.[12] Upon information and belief, Wells Fargo continues to engage in its practice of assessing APSN fees.[13]

21.    Plaintiffs have been harmed by Wells Fargo's conduct. Plaintiffs have been assessed overdraft fees despite Wells Fargo having not obtained consent using a compliant disclosure agreement. Plaintiffs have also been charged other unfair fees, such as APSN and representment fees, which also constitute a breach of contract. This action seeks damages, including actual damages, statutory damages under Regulation E, restitution, and injunctive relief due to, *inter alia*, Wells Fargo's practice of obtaining purported "affirmative consent" using a noncompliant opt-in disclosure agreement, practice of assessing Regulation E overdraft fees without first obtaining the proper consent, practice of utilizing noncompliant opt-in methods, and unlawfully assessing and unilaterally collecting unfair overdraft and NSF fees in violation of its contracts and disclosures as set forth herein.

### III    PARTIES

22.    Plaintiff Andrew Penuela is a resident of California, and a Wells Fargo accountholder at all relevant times.

23.    Plaintiff Koushik Charan is a resident of California, and a Wells Fargo accountholder at all relevant times.

24.    Plaintiff Jill Molaris is a resident of California, and a Wells Fargo accountholder at all relevant times.

25.    Plaintiff Maria Smythe is a resident of California, and a Wells Fargo accountholder at all relevant times.

---

[12] While Plaintiffs do not have every Account Agreement from Wells Fargo for the alleged statutory period, upon information and belief, the relevant contract language is similar.
[13] Upon information and belief, Wells Fargo stopped charging NSF fees in or around March of 2022.

-10-

First Amended Class Action Complaint
Case No. 4:24-cv-00766

26.    Plaintiff Jessica Willshire is a resident of California, and a Wells Fargo accountholder at all relevant times.

27.    Plaintiff Daymond Walton is a resident of Virginia, and a Wells Fargo accountholder at all relevant times.

28.    Based on information and belief, Defendant Wells Fargo is a bank with its headquarters located in San Francisco, California, and its principal place of business in Sioux Falls, South Dakota. Wells Fargo also has hundreds of branches throughout the state of California.

29.    Without limitation, defendants DOES 1 through 5, include agents, partners, joint ventures, subsidiaries, and/or affiliates of Defendant and, upon information and belief, also own and/or operate Defendant's branch locations. As used herein, where appropriate, the term "Defendant" is also inclusive of Defendants DOES 1 through 5.

30.    Plaintiffs are unaware of the true names of Defendants DOES 1 through 5. Defendants DOES 1 through 5 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against Defendants DOES 1 through 5 when the true names are ascertained, or as permitted by law or the Court.

31.    There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named defendants (including DOES) such that any corporate individuality and separateness between the named defendants has ceased, and that the named defendants are *alter egos* in that they effectively operate as a single enterprise, or are mere instrumentalities of one another.

32.    At all material times herein, each defendant was the agent, servant, co-conspirator, and/or employer of each of the remaining defendants; acted within the purpose, scope, and course of said agency, service, conspiracy, and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants; and ratified and approved the acts of the other defendants. However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

-11-

First Amended Class Action Complaint
Case No. 4:24-cv-00766

33.     Whenever reference is made in this First Amended Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

34.     As to the conduct alleged herein, each act was authorized, ratified, or directed by Defendant's officers, directors, or managing agents.

## IV     JURISDICTION AND VENUE

35.     This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331, 15 U.S.C. § 1693m, 28 U.S.C. § 1367(a), and 28 U.S.C. § 2201. This Court also has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 under the Class Action Fairness Act of 2005 because: (i) there are 100 or more Class Members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different States.

36.     Venue is proper in this District because Wells Fargo transacts business, certain Plaintiffs and similarly situated persons entered contracts with Wells Fargo, and Wells Fargo executed the unlawful policies and practices which are the subject of this action, in this District.

## V     BACKGROUND

### A.    Defendant Wells Fargo

37.     Wells Fargo is a nationally chartered bank headquartered in San Francisco, California with over 7,000 branches and 13,000 automatic teller machines (ATMs) nationwide. As of September 2020, Wells Fargo reported that it had over 70,000,000 customers and 266,000 employees. Wells Fargo also reported that it holds approximately $1.92 trillion in assets on behalf of its customers. In 2023 alone, Wells Fargo collected almost 1.3 billion in consumer overdraft-related service charges on accounts intended primarily for individuals with personal, household or family use.

-12-

38.    One of the main services that Wells Fargo offers is checking accounts. A checking account balance can increase or be credited in a variety of ways, including automatic payroll deposits; electronic deposits; incoming transfers; deposits at a branch; and deposits at ATM machines. Debits decreasing the amount in a checking account can be made by using a debit card for purchases of goods and services (point of sale purchases) that can be one-time purchases or recurring automatic purchases; through withdrawal of money at an ATM; or by electronic purchases. Additionally, some of the other ways to debit the account include writing checks; issuing electronic checks; scheduling Automated Clearing House (ACH) transactions (which can include recurring automatic payments or one-time payments); transferring funds; and other types of transactions that debit from a checking account.

39.    In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), Wells Fargo assesses overdraft fees (a fee for paying an overdrawn item) and non-sufficient funds ("NSF") fees (a fee for a declined, unpaid returned item) to accounts when it claims to have determined that an account has been overdrawn.

40.    The underlying principle for charging overdraft fees is that when a financial institution pays a transaction by advancing its own funds to cover the accountholder's insufficient funds, it may charge a *contracted and/or disclosed* fee, provided that charging the fee is not prohibited by some legal regulation. The fee Wells Fargo charges here constitutes very expensive credit that harms the poorest customers and creates substantial profit. According to a 2014 CFPB study:[14]

- Overdraft and NSF fees constitute the majority of the total checking account fees that customers incur.

---

[14] https://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf (last visited Jan. 30, 2024).

First Amended Class Action Complaint
Case No. 4:24-cv-00766

- The transactions leading to overdrafts are often quite small. In the case of debit card transactions, the median amount of the transaction that leads to an overdraft fee is $24.
- The average overdraft fee for bigger banks is $34 and $31 for smaller banks and credit unions.

Accordingly, as highlighted in the CFPB Press Release related to this study:

> Put in lending terms, if a consumer borrowed $24 for three days and paid the median overdraft of $34, **such a loan would carry a 17,000 percent annual percentage rate (APR).**

(Emphasis added)[15]

41.    Overdraft and NSF fees constitute a primary revenue generator for banks and credit unions. According to one banking industry market research company, Moebs Services, banks and credit unions in 2018 alone generated an estimated $34.5 billion on overdraft fees.[16]

42.    Accordingly, the overdraft fee is a punitive fee rather than a service fee, which makes it even more unfair because most account overdrafts are accidental and involve a small amount of money in relation to the fee. A 2012 study found that more than 90% of customers who were assessed overdraft fees overdrew their accounts by mistake.[17]  In a 2014 study, more than 60% of the transactions that resulted in a large overdraft fee were for less than $50.[18]  More than 50% of those assessed overdraft fees do

---

[15] CFPB, CFPB Finds Small Debit Purchases Lead to Expensive Overdraft Charges (7/31/2014) https://www.consumerfinance.gov/about-us/newsroom/cfpb-finds-small-debit-purchases-lead-to-expensive-overdraft-charges/ (last visited Jan. 30, 2024).
[16] Moebs Services, Overdraft Revenue Inches Up in 2018 (March 27, 2019), http://www.moebs.com/Portals/0/pdf/Articles/Overdraft%20Revenue%20Inches%20Up%20in%202018%200032719-1.pdf?ver=2019-03-27-115625-283 (last visited Jan. 30, 2024).
[17] Pew Charitable Trust Report, *Overdraft America: Confusion and Concerns about Bank Practices*, at p. 4 (May 2012), https://www.pewtrusts.org/-/media/legacy/uploadedfiles/pcs_assets/2012/sciboverdraft20america1pdf.pdf (last visited January 30, 2024).
[18] Pew Charitable Trust Report, *Overdrawn*, at p. 8 (June 2014), https://www.pewtrusts.org/-/media/assets/2014/06/26/safe_checking_overdraft_survey_report.pdf (last visited Jan. 30, 2024).

-14-

not recall opting into an overdraft program, (*id*. at p. 5), and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than being charged a very large fee, (*id*. at p. 10).

43.      Finally, the financial impact of these fees falls on the most vulnerable among the banking population with the least ability to absorb the overdraft fees. Younger, lower-income, and non-white accountholders are among those most likely to be assessed overdraft fees. *Id*. at p. 3. A 25-year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old. *Id*. More than 50% of the customers assessed overdraft fees earned under $40,000 per year. *Id*. at p. 4. And non-whites are 83% more likely to pay an overdraft fee than whites. *Id*. at p. 3.

**B.    Plaintiffs**

44.      Plaintiff Andrew Penuela is a resident of the state of California and a customer of Defendant. Plaintiff has held an account with Wells Fargo at all times relevant to the allegations and was not opted into Wells Fargo's overdraft program for his debit card and ATM transactions. As will be established using Wells Fargo's own records, Plaintiff has been assessed numerous improper fees on ATM transactions. By way of example, upon information and belief, on January 19, 2022, Plaintiff was assessed two $35 overdraft fees on two separate ATM withdrawals made on the same day. Given Plaintiff was not opted-in, Wells Fargo is prohibited per Regulation E from charging him overdraft fees for ATM transactions. Yet, Wells Fargo charged these fees anyway. The extent of improper charges on Regulation E governed transactions against Plaintiff and other customers will be determined in the course of discovery using Defendant's records.

45.      Plaintiff Koushik Charan is a resident of the state of California and a customer of Defendant. Plaintiff has held an account with Wells Fargo at all times relevant to the allegations. As will be established using Wells Fargo's own records, Plaintiff has been assessed numerous improper APSN fees. By the way of example, upon information and belief, on September 16, 2021, Plaintiff made numerous transactions that Wells Fargo authorized on a positive balance, but due to intervening transactions

First Amended Class Action Complaint
Case No. 4:24-cv-00766

occurring prior to posting, the balance had gone negative by the time the transactions posted resulting in the improper assessment of overdraft fees. The extent of improper charges assessed on Plaintiff and other customers will be determined in the course of discovery using Defendant's records.

46.    Plaintiff Jill Molaris is a resident of the state of California and a customer of Defendant. Plaintiff has held an account with Wells Fargo at all times relevant to the allegations. As will be established using Wells Fargo's own records, Plaintiff has been assessed numerous improper overdraft fees, including those in violation of Regulation E. By the way of example, upon information and belief, on February 14, 2022, Plaintiff was assessed two $35 overdraft fees on two separate one-time debit card transactions made on February 11, 2022. Furthermore, upon information and belief, on February 15, 2022, Plaintiff was assessed one $35 overdraft fee on a separate ATM withdrawal made on February 13, 2022. Defendant continued to assess overdraft fees numerous times on Plaintiff's similar transactions. The extent of improper charges assessed on Plaintiff and other customers will be determined in the course of discovery using Defendant's records.

47.    Plaintiff Maria Smythe is a resident of the state of California and a customer of Defendant. Plaintiff has held an account with Wells Fargo at all times relevant to the allegations. As will be established using Wells Fargo's own records, Plaintiff has been assessed numerous improper representment fees. By the way of example, upon information and belief, on October 14, 2021 and October 19, 2021, Plaintiff was assessed several $35 NSF and overdraft fees for a single transaction item on October 13, 2021. Defendant continued to assess NSF and overdraft fees numerous times on Plaintiff's similar transactions. The extent of improper charges assessed on Plaintiff and other customers will be determined in the course of discovery using Defendant's records.

48.    Plaintiff Jessica Willshire is a resident of the state of California and a customer of Defendant. Plaintiff has held an account with Wells Fargo at all times relevant to the allegations. As will be established using Wells Fargo's own records, Plaintiff has been assessed numerous improper representment fees. By the way of

-16-

First Amended Class Action Complaint
Case No. 4:24-cv-00766

example, upon information and belief, on November 12, 2021 and November 23, 2021, Plaintiff was assessed a $35 NSF fee and an additional $35 overdraft fee on a single transaction item on November 10, 2021. Defendant continued to assess NSF and overdraft fees numerous times on Plaintiff's similar transactions. The extent of improper charges assessed on Plaintiff and other customers will be determined in the course of discovery using Defendant's records.

49.      Plaintiff Daymond Walton is a resident of the state of Virginia and a customer of Defendant. Plaintiff has held an account with Wells Fargo at all times relevant to the allegations. As will be established using Wells Fargo's own records, Plaintiff has been assessed numerous improper representment fees. By the way of example, upon information and belief, on July 06, 2021 and July 12, 2021, Plaintiff was assessed multiple $35 NSF fees on a single transaction item on July 02, 2021. Defendant continued to assess NSF and overdraft fees numerous times on Plaintiff's similar transactions. The extent of improper charges assessed on Plaintiff and other customers will be determined in the course of discovery using Defendant's records.

**C.      Regulation E Introduces Rules to Protect Consumers from Predatory Overdraft Fees**

50.      The Federal Reserve, having regulatory oversight over financial institutions, recognized that financial institutions had a strong incentive to adopt overdraft programs without giving consumers a choice, since overdraft fees are collected on a nearly risk-free basis. Historically, banks could not make a decision on overdrafts until after the transaction occurred. Because this entailed a certain amount of risk, financial institutions usually imposed a fee to process the transaction as an overdraft. But as debit card and ATM use rose in popularity, both the number of transactions and the timing of their execution changed. There were more low dollar debit card transactions because debit card use was so convenient, and financial institutions now could either accept or reject transactions at the point of sale. As a result, by simply authorizing these low dollar transactions into overdraft, banks could collect large fees on low dollar transactions that

-17-

were almost always quickly repaid. It was a low risk, high reward for the financial institutions while customers suffered the costly effects.

51.    And more, these overdraft programs were usually not disclosed to customers, or if so, they were hidden in the middle of a lengthy, boilerplate account agreement. Unlike enrollment in other programs, the customer would be enrolled simply on the word of the banker (which, at Wells Fargo, involved additional questions outside the topic of overdraft fees because Wells Fargo incentivized sham account practices by its bankers for years).[19]

52.    To mitigate these incentives and to protect customers, the Federal Reserve Board amended Regulation E in 2009. Regulation E was designed to stop these practices. Customers were to get accurate disclosures in understandable language separate from all other information that they could review before they affirmatively consented to enrollment in an overdraft program covering one-time debit card and ATM transactions. Only then was the financial institution allowed to assess overdraft fees on these customers.

53.    With the creation of the CFPB, it subsequently undertook the study referenced above regarding financial institutions' overdraft programs and whether they were satisfying consumer needs. Unsurprisingly, the CFPB found that overdraft programs had a series of problems. The most pressing problem was that overdraft services were costly and damaging to accountholders. The percentage of accounts experiencing at least one overdraft (or NSF) transaction in 2011 was 27%, and the average amount of overdraft and NSF-related fees paid by accountholders was $225. The CFPB further estimated that the banking industry may have collected anywhere from $12.6 to $32

---

[19] U.S. Dept. of Justice, Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices Involving the Opening of Millions of Accounts without Customer Authorization, Feb. 21, 2020, https://www.justice.gov/opa/pr/wells-fargo-agrees-pay-3-billion-resolve-criminal-and-civil-investigations-sales-practices (last visited Jan. 30, 2024); Jack Kelly, Wells Fargo Forced to Pay $3 Billion for the Bank's Fake Account Scandal, Forbes, https://www.forbes.com/sites/jackkelly/2020/02/24/wells-fargo-forced-to-pay-3-billion-for-the-banks-fake-account-scandal/?sh=6251c00542d2 (last visited Jan. 30, 2024).

-18-

First Amended Class Action Complaint
Case No. 4:24-cv-00766

billion in consumer NSF and overdraft fees in 2011, depending on what assumptions the analyst used in calculating the percentage of reported fee income should be attributed to overdrafts. The CFPB also noted that there were numerous "variations in overdraft-related practices and policies," all of which could "affect when a transaction might overdraw a consumer's account and whether or not the consumer would be charged a fee."[20]

54.    Given the state of overdraft programs prior to Regulation E, it is easy to understand why the Federal Reserve was concerned about protecting consumers from financial institutions unilaterally imposing high fees. Banks and credit unions in this scenario had significant advantages over consumers when it came to imposing overdraft policies. By defaulting to charging fees for point-of-sale transactions, banks and credit unions created for themselves a virtual no-lose scenario—advance small amounts of funds (average $24) for a small period of time (average 3 days), then charge a large fee (average $34) that is unrelated to the amount of money advanced on behalf of the customer, resulting in a APR of thousands of percent interest (using averages - 17,000% APR), all while assuming very little risk because only a very small percentage of the overdraft customers failed to repay the overdraft fee.

**D.    Specific Regulation E Requirements**

55.    Because of the potential for financial institutions to skirt these requirements, Regulation E details specific prerequisites for enrolling in a financial institution's overdraft program. Prior to customers making a decision to give consent, the financial institution must first provide them with a disclosure (commonly referred to as an "opt-in" disclosure) describing the overdraft program. In addition to providing the disclosure to customers before opt-in, to qualify as a proper opt-in disclosure, that disclosure had to be

---

[20] The Federal Reserve has previously noted that "improvements in the disclosures provided to consumers could aid them in understanding the costs associated with overdrawing their accounts and promote better account management." 69 Fed. Reg. 31761 (June 7, 2004).

First Amended Class Action Complaint
Case No. 4:24-cv-00766

accurate, and in a "clear and readily understandable way," disclose the terms of the overdraft services set forth in the Regulation. 12 C.F.R. § 1005.4(a)(1).

56.     To avoid burying the necessary disclosure language with other unrelated or unnecessary information and ensure all necessary information was provided, the opt-in disclosure needed to be substantially similar to the one-page Model A-9 Form included in Regulation E. 12 C.F.R. § 1005.17(d).

57.     A hidden or buried disclosure is the same as no disclosure at all. So, Regulation E required that the opt-in disclosure be segregated from other disclosures and presented to customers as a stand-alone document. 12 C.F.R. § 1005.17(b)(1)(i). The financial institution was also required to avoid marketing the program and otherwise encouraging customers to join. *See* 12 CFR § 1005.1(b) (stating that "the primary objective of the act…is the protection of individual consumers engaging in electronic fund transfers and remittance transfers"); *see also* 12 CFR § 1005.1(b), cmt. 17(b)-4. Obtaining and verifying affirmative consent was similarly important. The financial institution had to obtain affirmative consent separately from other acknowledgements, either by signature (as provided for in the model form), or through some other recordable means of assent (such as the customer checking an electronic box or recording verbal assent). 12 C.F.R. § 1005.17, cmt 17(b)-6.

58.     Once having obtained the consumer's affirmative consent after this process is completed, the financial institution is required to provide the customer with confirmation of their consent, including instructions on how later to opt out. 12 C.F.R. § 1005.17(b)(1)(iv).

59.     It was only after complying with each of these requirements that a financial institution could charge these customers overdrafts fees on one-time debit card and ATM fees. But even after that, financial institutions maintained the responsibility to administer their overdraft programs in a non-deceptive and fair manner.

First Amended Class Action Complaint
Case No. 4:24-cv-00766

1

**E.     Regulation E Compliance**

2

     60.    In Regulation E's wake, some financial institutions decided to forego

3

charging overdraft fees on non-recurring debit card and ATM transactions. These include

4

large banks such as Bank of America, CitiBank, Capital One, Ally Bank, Discover and

5

smaller banks such as One West Bank, Axos Bank, First Republic Bank, and Mechanics

6

Bank. However, most financial institutions continued to maintain overdraft services on

7

one-time debit card and ATM withdrawals. As such, these banks and credit unions must

8

satisfy Regulation E's requirements in order to obtain compliant affirmative consent from

9

their accountholders before charging overdraft fees on eligible transactions.

10

     61.    With regard to the banks continuing to charge overdraft fees, the CFPB

11

continues to enforce actions against unfair and deceptive practices. In December 2023, it

12

took action against Atlantic Union Bank for illegally enrolling consumers in its checking

13

account overdraft programs. The CFPB concluded that Atlantic Union had "misled

14

consumers who enrolled in [the bank's] overdraft service by phone and failed to provide

15

proper disclosures."[21] In particular, Atlantic Union had instructed employees to give

16

verbal descriptions of the bank's overdraft coverage in place of reading the exact

17

disclosure statement demanded by Regulation E. Those oral descriptions, however, "did

18

not clearly explain which transactions were covered by the service, and made other

19

misleading statements about the terms and conditions of the service." The CFPB

20

discovered that some employees had "omitted key information about the cost of the

21

service and the fact that consumers could incur a hefty overdraft fee for each transaction

22

covered by the service."

23

**F.     CFPB Issues Guidance on "Junk Fees"**

24

     62.    In addition, the CFPB has recently issued guidance on other unfair and

25

deceptive fees. Examples include Authorize Positive, Settle Negative transactions

26

27

28

---

[21] CFPB, CFPB Orders Atlantic Union Bank to Pay $6.2 Million for Illegal Overdraft Fee Harvesting, Dec. 7, 2023, available at CFPB Orders Atlantic Union Bank to Pay $6.2 Million for Illegal Overdraft Fee Harvesting | Consumer Financial Protection Bureau (consumerfinance.gov).

First Amended Class Action Complaint
Case No. 4:24-cv-00766

("APSN") as well as assessing multiple fees on the same returned item ("representment fees").

63.    APSN transactions occur when a financial institution assesses overdraft fees when the consumer had a sufficient available balance at the time the transactions was authorized, but given the delay between authorization and settlement, the consumer's account balance is insufficient at the time of settlement. The CFPB has declared this practice unfair even when disclosed because "consumers [cannot] reasonably avoid the substantial injury" and the injury to consumers "[is] not outweighed by countervailing benefits to consumers or competition."[22] In addition, this practice also violates Wells Fargo's applicable contract, which only states that an overdraft will be assessed when a consumer lacks available funds.[23] However, at the time the transaction is authorized, the consumer has available funds so no fee should be assessed.

64.    In addition, the CFPB has declared that representment fees are also unfair. When a consumer writes a check or authorizes an ACH transaction, the merchant presents that item for payment. If a consumer does not have sufficient funds to pay for the transaction, the financial institution may decide to return the transaction item unpaid, causing an NSF fee to be incurred. However, some merchants re-present the same item again for payment, often multiple times. Representment on the merchant's part is not improper. However, Wells Fargo's practice of charging fees each time a merchant represents the same item not only breaches its own contract, which states that only one NSF fee will be assessed per item, regardless of how many times the item is presented by the merchant,[24] but is an unfair practice because the consumer has no means by which to prevent the representment of that item.

---

[22] CFPB, *Supervisory Highlights Junk Fees Update Special Edition,* October 2023, available at (consumerfinance.gov).
[23] *See* Ex. G at 26 (stating that "if your account has *insufficient funds as reflected by your available balance,* the Bank may assess overdraft and/or non-sufficient funds (NSF) fees") (emphasis added). Accordingly, if the consumer had a positive balance at the time of authorization, no overdraft fee was permitted to be assessed.
[24] *Id.* at 30 (stating that if an item is returned for insufficient funds, Wells Fargo may assess *"a returned item fee"* in the singular).

-22-

65.    As such, the CFPB has declared the policy of charging more than one NSF fee or an NSF fee followed by an overdraft fee on the same item unfair because consumers are not "reasonably able to avoid the fee because they [do] not know when merchants would re-present transactions…nor could [they] generally stop payments or revoke authorizations" and that such harm "is not outweighed by countervailing benefits to consumers or competition."[25]

66.    Wells Fargo has charged such unfair fees, including APSN overdraft fees, as well as representment fees when the same item is resubmitted by a merchant, in violation of the Consumer Financial Protection Act ("CFPA"), its applicable contracts and disclosures, and other laws governing unfair business practices.

## G.    The Dispute

67.    Wells Fargo has enrolled customers into Regulation E through opt-in at the branch during account opening; at the branch for an existing customer at a time other than account opening; online; and by telephone. Regardless of the means Wells Fargo used to enroll customers in its Regulation E program, prior to May 2022, its disclosures were flawed and failed to satisfy the requirements of Regulation E. Wells Fargo also violated several other opt-in requirements in the process of purportedly enrolling customers into the program. As a result, Wells Fargo enrolled customers into its Regulation E program using methods insufficient to justify charging overdraft fees at any time.

### Use of Descriptive Language in the Opt-in Disclosure Applicable to Each Method of Opt-in

68.    Prior to May 2022, Wells Fargo's opt-in disclosure, to the extent customers saw it, inaccurately described its overdraft program's terms. It stated that an overdraft occurs when there is not enough money in the account to cover a transaction, but Wells

---

[25] CFPB Bank of America, N.A. Consent Order, July 11, 2023, available at (consumerfinance.gov).

First Amended Class Action Complaint
Case No. 4:24-cv-00766

Fargo pays it anyway. This description has been consistently found either ambiguous or misleading by the numerous courts that have examined this exact language.[26]

69.     Like many other financial institutions, Wells Fargo calculates at least two different account balances for each customer's checking account. The "actual balance," "ledger balance," or "current balance" (herein referenced as "actual balance") are industry terms describing the full amount of money in a customer's account at a particular time. It is used when financial institutions report deposits to regulators, when they pay interest on an account, and when they issue monthly statements to customers. It is also used when the transaction is actually paid. The "available balance" represents the actual balance, with any amounts on which the bank has placed "holds" subtracted. Funds subject to these holds, especially debit holds, may or may not ever actually be posted to the account.[27]  But all funds subject to a hold remain in the customer's account until transferred to satisfy a transaction, which can take several days.

70.     Wells Fargo uses the "available balance" to assess overdraft fees because doing so increases its opportunities to charge fees. The available balance is often lower (but never higher) than the actual balance, creating a lower threshold against which transactions can be deemed overdrafts. But no matter what calculation the financial

---

[26] *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1239-40 (11th Cir. 2019); *Bettencourt v. Jeanne D'Arc Credit Union*, 370 F. Supp. 3d 258, 261-64 (D. Mass. 2019); *Pinkston-Poling v. Advia Credit Union*, 227 F. Supp. 3d 848, 854-56 (W.D. Mich. 2016); *Walbridge v. Northeast Credit Union*, 299 F. Supp. 3d 338, 343-46 (D.N.H. 2018) (holding that terms such as "enough money," "insufficient funds," "nonsufficient funds," "available funds," "insufficient available funds," and "account balance" were ambiguous); *Smith v. Bank of Hawaii*, No. 16-00513 JMS-RLP, 2017 WL 3597522, at *6–7 (D. Haw. Apr. 13, 2017) ("sporadic" use of terms such as "available" funds or balances insufficiently explained to consumer when overdraft fee could be charged); *Walker v. People's United Bank*, 305 F. Supp. 3d 365, 374–75 (D. Conn. 2018) (holding there was a "reasonable basis for a difference of opinion" regarding definition of "insufficient funds"); *Ramirez v. Baxter Credit Union*, No. 16-CV-03765-SI, 2017 WL 1064991, at *4-5 (N.D. Cal. Mar. 21, 2017); *Gunter v. United Fed. Credit Union*, No. 315CV00483MMDWGC, 2016 WL 3457009, at *3 (D. Nev. June 22, 2016); *Grenier v. Granite State Credit Union*, 570 F. Supp. 3d 18, 23 (D.N.H. 2021).

[27] Ayse Kelce, As Gas Prices Surge, Stations Now Hold Up to $175 of Your Money When You Swipe, WALL STREET JOURNAL, June 28, 2022, available at https://www.wsj.com/articles/as-gas-prices-surge-stations-now-hold-up-to-175-of-your-money-when-you-swipe-11656277411 (last visited Jan. 30, 2024).

institution uses, the account has **exactly the same** funds in it. A "hold" is an internal characterization defining a portion of the money in the account, but a "hold" placement removes *no* money from the account.

71.     The difference between these balances in the context of overdrafts is material to both the financial institution and accountholders. It is estimated that using the available balance increases the number of transactions assessed as overdrafts approximately 10-20%. In those transactions, sufficient funds exist in the account to pay the transaction and therefore the financial institution does not advance its own funds to cover the shortfall. Instead, the customer's own money pays for the transaction, but the customer is charged an overdraft fee anyway.

72.     Financial institutions have been put on notice by regulators, banking associations, their insurance companies and risk management departments, and from observing litigation and settlements that using the available balance to calculate overdrafts without disclosure likely violates the law. For instance, the FDIC stated in 2019:

> Institutions' processing systems utilize an "available balance" method or a "ledger balance" method to assess overdraft fees. The FDIC identified issues regarding certain overdraft programs that used an available balance method to determine when overdraft fees could be assessed. Specifically, FDIC examiners observed potentially unfair or deceptive practices when institutions using an available balance method assessed more overdraft fees than were appropriate based on the consumer's actual spending or when institutions did not adequately describe how the available balance method works in connection with overdrafts.[28]

73.     Institutions will process transactions using either the "available balance" method or the "ledger balance" method to assess overdraft fees. The FDIC identified issues regarding certain overdraft programs that used an available balance method to determine when overdraft fees could be assessed. Specifically, FDIC examiners observed potentially unfair or deceptive practices when institutions using an available balance

---

[28]https://www.fdic.gov/regulations/examinations/consumercomplsupervisoryhighlights.pdf (last visited Jan 30, 2024).

First Amended Class Action Complaint
Case No. 4:24-cv-00766

method assessed more overdraft fees than were appropriate based on the consumer's actual spending or when institutions did not adequately describe how the available balance method works in connection with overdrafts.[29]

74.    And in its Winter 2015 Supervisory Highlights, the CFPB explained that:

> A ledger-balance method factors in only settled transactions in calculating an account's balance; an available-balance method calculates an account's balance based on electronic transactions that the institutions have authorized (and therefore are obligated to pay) but not yet settled, along with settled transactions. An available balance also reflects holds on deposits that have not yet cleared. Examiners observed that in some instances, transactions that would not have resulted in an overdraft (or an overdraft fee) under a ledger-balance method did result in an overdraft (and an overdraft fee) under an available-balance method. At one or more financial institutions, examiners noted that these changes to the balance calculation method used were not disclosed at all, or were not sufficiently disclosed, resulting in customers being misled as to the circumstances under which overdraft fees would be assessed. Because these misleading practices could be material to a reasonable consumer's decision making and actions, they were found to be deceptive.[30]

75.    Accordingly, describing an overdraft as "not having enough money in the account to cover a transaction, but we pay [the transaction] anyway" without defining the terms "money in the account" or mentioning the "available balance" within the opt-in disclosure is at best ambiguous, likely deceptive, and either way violates Regulation E's requirement to provide a clear and understandable definition of the overdraft practice.

## H.    Wells Fargo's History of Improper Fee Practices

### Wells Fargo's Unfair Transaction Posting Order

76.    Increasing the need for judicial intervention and injunction, following a bench trial before Judge William Alsup, Wells Fargo was found in 2010 to have engaged in profiteering and gouging customers with regard to its overdraft practices at that time. It was also found to have misrepresented the manner and order in which it posted transactions and charged overdraft fees as a result. *Gutierrez v. Wells Fargo Bank, N.A.*,

---

[29] https://www.fdic.gov/regulations/examinations/consumercomplsupervisoryhighlights.pdf (last visited Jan. 30, 2024).
[30] https://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf, p. 8 (last visited Jan. 30, 2024).

First Amended Class Action Complaint
Case No. 4:24-cv-00766

730 F. Supp. 2d 1080, 1083 (N.D. Cal. 2010), aff'd in part, rev'd in part and remanded sub nom. *Gutierrez v. Wells Fargo Bank, N.A.*, 704 F.3d 712 (9th Cir. 2012). After the appellate courts upheld the trial court's findings, the trial court entered an order permanently enjoining Wells Fargo from making any false or misleading representations relating to the posting order of debit-card transactions. *Gutierrez v. Wells Fargo Bank, N.A.*, 944 F. Supp. 2d 819, 830 (N.D. Cal. 2013), aff'd in part, vacated in part, remanded sub nom. *Gutierrez v. Wells Fargo Bank, N.A.*, 589 F. App'x 824 (9th Cir. 2014).

### In or around 2010, Wells Fargo Adopts Noncompliant Regulation E Opt-in Disclosure Agreement

77.    Beginning in or around 2010, Wells Fargo started opting customers into its overdraft practices using an opt-in disclosure agreement titled, *"What You Need to Know About Overdrafts and Overdraft Fees."* (Ex. A.)  A reasonable consumer reading a disclosure agreement requiring a signature or acknowledgement, and which relates to overdrafts and overdraft fees and represents that it contains information the customer needs to know about overdrafts and overdraft fees, would rely on the opt-in disclosure agreement without supplementing that knowledge with reference to other marketing materials and or account agreement language relating to overdrafts.

78.    The opt-in disclosure agreement explained that an overdraft "occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway."  It made no reference to "available" balance, "available" funds or any description of how Wells Fargo's internal hold policies affect the balance. Instead, it explained that an overdraft occurred when there was not enough "money in [the] account" and Wells Fargo pays it from their own funds.

79.    This definition misleads consumers into believing that Wells Fargo uses the actual balance to calculate overdrafts. By using ambiguous language, Wells Fargo failed to provide a clear and easily understandable description of its overdraft services in its opt-in disclosure agreement.

-27-

80.    Many financial institutions that use the available balance to calculate overdrafts have specifically addressed the practice in their opt-in disclosure agreements. San Diego County Credit Union, for example, defines an "overdraft" as when "the available balance in your account is nonsufficient to cover a transaction at the time that the transaction posts to your account, but we pay it anyway."  Synovus Bank defines an overdraft similarly to Wells Fargo, but adds the additional caveat that it "authorize[s] and pay[s] transactions using the Available Balance in [the] account," and then specifically defines the Available Balance. TD Bank's opt-in disclosure agreement states as follows: "An overdraft occurs when your available balance is not sufficient to cover a transaction, but we pay it anyway. Your available balance is reduced by any 'pending' debit card transactions (purchases and ATM withdrawals) and includes any deposited funds that have been made available pursuant to our Funds Availability Policy." Similarly, Communication Federal Credit Union's opt-in disclosure agreement states, "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, or the transaction exceeds your available balance, but we pay it anyway. 'Available Balance' is your account balance less any holds placed on your account."

81.    In addition, many financial institutions that use the actual balance to determine whether an account is in overdraft (meaning it looks strictly at the amount of funds in an account), as does, *e.g.*, MidFlorida Credit Union, use the same language as Wells Fargo, to reference the actual balance, not the available balance. *See* https://www.midflorida.com/terms-and-conditions/overdraft-agreement/ (last visited Feb. 6, 2024) (explaining that the language "[a]n overdraft occurs when you do not have enough money in your account to cover a transactions, but MIDFLORIDA pays it anyway" refers to the "[a]ctual balance." Thus, if there is sufficient money in the account to cover a transaction—even if the money is subject to a hold for pending transactions— then the financial institution will not charge an overdraft fee.

82.    Here, Wells Fargo's failure to accurately, clearly, and in an easily understandable way identify the balance Wells Fargo uses to assess overdraft fees in the

-28-

First Amended Class Action Complaint
Case No. 4:24-cv-00766

stand-alone opt-in disclosure agreement resulted in its failure to obtain the appropriate affirmative consent necessary to opt customers into its overdraft program.

### Wells Fargo's Practices Violate Regulation E

83.    Prior to May 2022, Wells Fargo used an opt-in disclosure that did not conform to Regulation E's requirements. Instead of a one-page document that was substantially similar to Model Form A-9, Wells Fargo used an 8-page marketing overdraft brochure as its purported "opt-in" disclosure. One page contained disclosures, but they were not segregated from other information, which was illegally targeted at convincing consumers to give consent in any event (assuming the customer even saw the disclosure agreement and/or accompanying marketing statements).

84.    Nor was the eight-page brochure provided to customers as a standalone document. Instead, it was placed in a new account folder containing piles of legal boilerplate, including the account agreement, privacy notice, fee schedule and other documents. These documents were not provided to a new customer until after a Wells Fargo employee verbally described the overdraft program (a practice recently condemned by the CFPB) and asked customers if they wanted to enroll.[31]

85.    Account representatives were allowed to sell DCOS without a script, and the same representatives encouraged consumers to enroll without obtaining signatures or other recorded affirmation by the consumer. As such, Wells Fargo failed to provide consumers with a reasonable opportunity to affirmatively consent prior to charging overdraft fees on one-time debit card and ATM transactions.

86.    Finally, upon information and belief, Wells Fargo failed to provide written confirmation that consumers had been opted into DCOS, and that they could revoke their consent at any time, as required by Regulation E.

87.    These practices violated Regulation E because Wells Fargo failed to provide accurate, clear, and understandable language when describing the overdraft program in its

---

[31] See FN 2, *supra.*

First Amended Class Action Complaint
Case No. 4:24-cv-00766

disclosure language. It further violated Regulation E by failing to provide the disclosure in a segregated, stand-alone document. Wells Fargo also violated Regulation E when it waited to provide the necessary disclosures until after enrolling customers into the overdraft program based on a verbal pitch by employees. Finally, Wells Fargo violated Regulation E by enrolling consumers into DCOS without obtaining a separate signature or using another independently objective way of obtaining affirmative consent and failing to provide written confirmation of enrollment and right to revoke consent.

### Opt-in Existing Customers at the Branch

88.    Wells Fargo opted-in existing customers by disclosing that Wells Fargo used the "money in the account" to calculate overdrafts.

89.    This procedure violated Regulation E because Wells Fargo failed to use accurate, clear, and understandable language to describe DCOS. Wells Fargo further violated Regulation E by enrolling these customers without obtaining a separate written agreement or another objective verification of affirmative consent.

### Opt-in Through Online Customers

90.    Wells Fargo opted-in existing customers by disclosing that Wells Fargo used the "money in the account" to calculate overdrafts. (Ex. A.)

91.    The opt-in for online customers also violated Regulation E because Wells Fargo failed to use accurate, clear and understandable language to describe DCOS.

### Opt-in by Telephone Customers

92.    Wells Fargo opted-in telephone customers without providing those customers with either the written or verbal disclosure Regulation E required.

93.    The opt-in for telephone customers violated Regulation E for failure to use a disclosure to opt-in customers as Regulation E requires.

### Wells Fargo Fails to Properly Re-Opt in Customers

94.    On May 9, 2022, Wells Fargo changed its opt-in practice to conform with Regulation E (although these compliant practices apply only to new customers after May 18, 2022). Wells Fargo now uses a one-page segregated disclosure form that specifically

First Amended Class Action Complaint
Case No. 4:24-cv-00766

discloses its use of the available balance to assess overdraft fees. In addition, Wells Fargo began to require signatures before opt-in. However, it has not applied the new procedure to customers enrolled prior to the change. Moreover, upon information and belief, Wells Fargo continues to charge certain customers overdraft fees on ATM transactions without any enrollment into DCOS. As a result, Wells Fargo has done nothing to rectify the fact that it failed to enroll customers into DCOS by following Regulation E's express requirements.

**I.      Wells Fargo's Additional Improper Fee Practices**

95.      Wells Fargo also engages in additional conduct constituting unfair and deceptive business practice, but is not covered by the plain language of Regulation E. First, Wells Fargo improperly charges multiple fees for the same electronic transaction or item. When a consumer triggers a payment and Wells Fargo determines that there is not enough money in the account to cover the transaction, Wells Fargo charges a $35 NSF fee and does not pay the transaction. If the payee again presents the same item for processing and there still is not enough money in the account to cover the payment, Wells Fargo then charges an additional $35 fee. It will then do this as many times as the item is re-presented, even though the consumer has only triggered a single transaction.

96.      Similarly, Wells Fargo engages in unfair and deceptive business practices by charging overdraft fees on so-called "APSN transactions." These transactions occur when an individual engages in a transaction and a temporary authorization hold is placed on the account for the amount of the transaction. When the hold is placed on the account, there are positive funds available in the account balance to cover the transaction, though subsequent transactions may put the account into a negative balance.

97.      In such cases, Wells Fargo is assured that customers will have sufficient funds to cover the transaction, because the funds have been held and sequestered for payment. Nevertheless, Wells Fargo will later assess overdraft fees on these same transactions if and when they settle sometime later into a negative balance.

First Amended Class Action Complaint
Case No. 4:24-cv-00766

98.    In addition to being unfair and deceptive, such practices also violate Wells Fargo's Account Agreement. Specifically, Wells Fargo's Account Agreement states that "if an item is returned for insufficient funds, [Wells Fargo] may assess *a returned item fee*" in the singular.[32] The only reasonable construction of such language is that even if the same item is resubmitted multiple times, the item (singular) is subject to one fee (singular). As such, while the first NSF fee is not at issue, the second (or sometimes third) NSF or overdraft fee assessed on the same item constitutes a breach of contract.

99.    Further, Wells Fargo's APSN practice is also in violation of its Account Agreement terms. When a debit card transaction is authorized, intervening transactions may come out before the transaction "settles." However, Wells Fargo's contract states that an overdraft occurs when an account has an insufficient available balance.[33] The only reasonable construction is that if the account contains sufficient available funds at the time of authorization, an overdraft will not be assessed. Making overdraft determinations at a different time than when the transaction was authorized, such as when the bank actually pays the transaction, which could occur several days later, is not provided for by the contract, and not within a consumer's reasonable expectations.

100.    Accordingly, Wells Fargo's APSN and representment fee practices violate its contracts.

## J.    Plaintiffs Submit Their Demands to AAA Expecting to Arbitrate Their Claims Per the Account Agreement

101.    Despite Wells Fargo's 2022 change of practice, customers enrolled in DCOS prior to May 2022 were never enrolled in a manner conforming with Regulation E. Moreover, some customers are being charged overdraft fees on ATM transactions even if not enrolled in DCOS. To assert claims related to Wells Fargo's conduct, many have

---

[32] Ex. G at 30.
[33] *Id.* at 27 (stating that "if the available balance in your account is not enough to pay all of your transactions, we will take the following steps….and decide whether to pay your transaction into overdraft or return it unpaid").

First Amended Class Action Complaint
Case No. 4:24-cv-00766

attempted to avail themselves of the arbitration procedure specified in the Account Agreement.

102.  On April 13, 2022, Plaintiff Andrew Penuela served the American Arbitration Association with a demand alleging that Wells Fargo had breached the Account Agreement, Regulation E, and California's Unfair Competition Law (Section 17200) by illegally charging Plaintiff various overdraft fees.

103.  On June 09, 2022, Plaintiff Koushik Charan served the American Arbitration Association with a demand alleging that Wells Fargo had breached the Account Agreement, Regulation E, and California's Unfair Competition Law (Section 17200) by illegally charging Plaintiff various overdraft fees.

104.  On May 06, 2022, Plaintiff Jill Molaris served the American Arbitration Association with a demand alleging that Wells Fargo had breached the Account Agreement, Regulation E, and California's Unfair Competition Law (Section 17200) by illegally charging Plaintiff various overdraft fees.

105.  On June 09, 2022, Plaintiff Maria Smythe served the American Arbitration Association with a demand alleging that Wells Fargo had breached the Account Agreement, Regulation E, and California's Unfair Competition Law (Section 17200) by illegally charging Plaintiff various overdraft fees.

106.  On August 30, 2022, Plaintiff Jessica Willshire served the American Arbitration Association with a demand alleging that Wells Fargo had breached the Account Agreement, Regulation E, and California's Unfair Competition Law (Section 17200) by illegally charging Plaintiff various overdraft fees.

107.  On April 13, 2022, Plaintiff Daymond Walton served the American Arbitration Association with a demand alleging that Wells Fargo had breached the Account Agreement, Regulation E, and Virginia State Consumer Fraud laws by illegally charging Plaintiff various overdraft fees.

108.  Thousands of other Claimants also file their demands with AAA between February 02, 2022 and October 11, 2023. Many of these claims contained allegations of

First Amended Class Action Complaint
Case No. 4:24-cv-00766

representation and APSN violations in addition to Regulation E and consumer fraud violations.

109.    The Claimants filed individually in arbitration because Wells Fargo's Account Agreement purportedly requires individual customers to waive all rights to participate in a class or act as a class representative. It then provides that the AAA's Consumer Arbitration Rules and the Federal Arbitration Act will govern any arbitral proceedings going forward.

110.    Each Plaintiff complied with the filing requirements described in the AAA's Consumer Arbitration Rules, specifically Rule 2, which requires that Claimants "briefly explain the dispute, list the names and addresses of the consumer and the business, and, if known, the names of any representatives of the consumer and the business, specify the amount of money in dispute, if applicable, identify the requested location for the hearing if an in-person hearing is requested, and state what the claimant wants." Each Plaintiff provided the requisite information. Moreover, AAA accepted each Plaintiff's claim and confirmed with each, in writing, that they had satisfied AAA's filing requirements.

## K.    Wells Fargo and AAA's Collusive Relationship

111.    Unfortunately, Plaintiffs were not submitting their claims to the neutral, fair, independent administrator that they had been promised. To the contrary, AAA's governing council is dominated by law firms representing banks and other large corporations using arbitration clauses that mandate the use of AAA to resolve disputes. AAA brags in its 2022 annual report that its "Council and Board of Directors afforded executives a sweeping view of the latest developments and best thinking from the for-profit and non-profit sectors."[34]

112.    In addition, its "Council of 80" includes multiple law firms who represent banks generally and Wells Fargo specifically, and who have influenced AAA rules to

---

[34] Exhibit F at 7.

First Amended Class Action Complaint
Case No. 4:24-cv-00766

benefit large corporations like Wells Fargo at the expense of consumers.[35] Mayer Brown LLP—which regularly serves as counsel to Wells Fargo—used its influence to shape AAA's rules, making it more difficult for consumers to arbitrate their claims, or, in many cases like those of Plaintiffs, increasing their burdens, requiring multiple arbitrations, or denying them the opportunity to obtain remedies. While the AAA rules are one-sided and unfair to consumers, designed as they are to suppress consumer claims, this is not the nature of Plaintiffs' challenger. Rather, AAA's inherent lack of neutrality is contrary to statements Wells Fargo and AAA both make that AAA is a neutral third party in the course of inducing consumers to accept arbitration.

113.    Among the events and actions demonstrating AAA's lack of neutrality and independence are the following:

- One of America's most anti-consumer advocacy organizations is the Chamber of Commerce. In particular, the Chamber stringently opposes consumer class actions as a procedural mechanism for resolving consumer claims against large companies, including banks.[36]

- Mayer Brown LLP has repeatedly represented the Chamber of Commerce, banks, and other large corporations to advocate that Courts must enforce arbitration clauses to bar class actions.[37]

- After the Chamber of Commerce, Mayer Brown, and other law firms represented on AAA's Council achieved significant success in enforcing corporate arbitration clauses used against consumers, consumers began filing thousands of individual cases in arbitration. Without the class action mechanism to resolve small actions, large-scale arbitrations such as these were the only option consumers could use to pursue their claims.

- Four Mayer Brown, LLP attorneys, led by Andrew J. Pincus, a prominent advocate before the U.S. Supreme Court for businesses and banks seeking to dismiss class actions and enforce arbitration agreements, authorized a publication for the U.S. Chamber of Commerce Institute for Legal Reform, a biased

---

[35] *Id.* at 27-29.
[36] *See* **Ex. H,** *Mass Arbitration Shakedown, Coercing Unjustified Settlements*, U.S. Chamber of Commerce Institute for Legal Reform, February 2023.
[37] *Id.*

-35-

First Amended Class Action Complaint
Case No. 4:24-cv-00766

publication noting that arbitration could be manipulated to increase the likelihood of defeating consumer claims.[38]

- A prominent part of the Mayer Brown strategy was to overhaul applicable Arbitration Rules and Fees to prevent successful consumer arbitrations.[39] Moreover, these changes were specifically directed at AAA, which Mayer Brown's client, Wells Fargo, had long since selected as its arbitration administrator.[40] These suggested changes included:
  - o Requiring Claimants to submit case proof information before being allowed to file a claim.
  - o Requiring Claimants to submit personal identifying information such as account numbers before proceeding with a claim.
  - o Using an AAA-appointed "process arbitrator" to resolve certain preliminary matters *en masse* before cases could proceed to an individual merits arbitrator.

- At the same time that Mayer Brown was drafting its jeremiad against mass arbitration, AAA began mysteriously appointing "process arbitrators" to so-called "mass arbitration" cases. For example, in October 2022, AAA assigned a "Process Arbitrator" to a group of cases filed against Wells Fargo, lacking any basis in the rules for doing so. Then, the Process Arbitrator ordered the following, despite the lack of any rules permitting these actions:
  - o Claimants were required to submit case proof information before AAA could accept their claim, even though such proof was in Wells Fargo's possession and not Claimants'.
  - o Claimants were required to submit personal identifying information such as account numbers before proceeding with a claim.
  - o The Process Arbitrator also made substantive rulings dismissing thousands of cases without giving the Claimants an opportunity to obtain records or conduct discovery to gather the requisite proof from Wells Fargo that the Process Arbitrator was now requiring Claimants to present in order to bring their claims.

- On April 1, 2024, AAA formalized the adoption of rules designed to prevent and make it more difficult for Claimants to bring claims. It enacted Mass Arbitration

---

[38] *Id.*
[39] *Id.* at 56.
[40] *Id.* at 56-57.

First Amended Class Action Complaint
Case No. 4:24-cv-00766

Supplementary Rules[41] imposing new requirements that included the suggestions Mayer Brown had made:

- o Requiring Claimants to submit case proof information before being allowed to file a claim.
- o Requiring Claimants to submit personal identifying information such as account numbers before proceeding with a claim.
- o Requiring AAA to administratively appoint a Process Administrator who would have virtually unlimited power to decide substantive and administrative issues including the "conditions precedent" for Claimants to proceed with claims.  There were no corresponding requirements for Respondents. All without any meaningful review or ability to appeal.

114.    Wells Fargo and its anti-consumer allies were working behind the scenes to rig the game even as it was telling consumers that arbitration would be a fair, neutral, and independent forum for their claims. The fact that AAA was imposing these purported requirements before the Supplementary Rules were even adopted is strong evidence that AAA is not neutral by way of its governing structure, and large corporations like Wells Fargo are exploiting the process to their advantage at the expense of consumers, including Plaintiffs.

115.    Inherent in any claim resolution is transparency and neutrality of the decision maker.  That obligation is heightened when both Wells Fargo and AAA falsely claim AAA is neutral.  The lack of neutrality in the governing structure and direction and control of AAA, is sufficient for finding that the arbitration provision in Wells Fargo's Account Agreement should not be enforced.

116.    Further, it is impossible to ignore the financial benefit accruing to AAA even as it professes to be a non-profit firm.  In 2022, AAA reported revenue of over $142 million, assets of over $400 million, including over $300 million in cash and investments, and its CEO made over $1.3 million per year.

---

[41] *See* **Exhibit I,** AAA Mass Arbitration Supplementary Rules, April 1, 2024.

-37-

First Amended Class Action Complaint
Case No. 4:24-cv-00766

**L.**    **Wells Fargo Prevents Plaintiffs from Serving Demands and Obtaining Hearings**

117.    Here, rather than proceed with appointing arbitrators, AAA arbitrarily imposed its purportedly new procedural requirements for multiple case filing even though these requirements were not reflected in any set of rules at the time Plaintiffs filed their arbitration demands, nor were they in effect when Plaintiffs entered into their Account Agreements with Wells Fargo. But these new requirements contradicted both the terms of arbitration agreement supposedly entered into by the parties, as well what would eventually be reflected in AAA's Supplementary Rules, both of which promised to "streamline the administration of large volume filings" involving the same parties.[42] Indeed, the AAA's stated purpose was to provide "an efficient and economic path toward resolution of multiple *individual* disputes."[43] But AAA and Wells Fargo used these rules to force Plaintiffs into a mass arbitration inter-dependent on the claims and actions of the other Claimants, which was anything but efficient or economical.

118.    Theoretically, the Supplementary Rules are meant to bifurcate the arbitration process. A "Process Arbitrator" decides "administrative issues," after which its decisions are "final and binding upon the parties and Merit Arbitrator(s)." Supp. Rule MC-6. After the "administrative issues" are resolved, the appointed Merits Arbitrators hold bilateral proceedings and resolve the individual cases on their merits. Supp. Rule MC-6, 7. To that end, AAA appointed a "process arbitrator" in these cases.

**M.**    **Wells Fargo Imposes Class-wide Procedures in Violation of the Agreement**

119.    Though the Process Arbitrator was supposed to expedite individual arbitrations, Wells Fargo saw an opportunity to game the system. After the Process Arbitrator's appointment, Wells Fargo abandoned any pretense that it would pursue

---

[42] AAA Supplementary Rules for Multiple Case Filings Introduction.
[43] Under Supplementary Rule MC-2, in order to file a demand, "the filing party shall adhere to the filing requirements set forth in the applicable rules." As such, at all relevant times, the filing requirements under AAA Consumer Rules, Rule 2, are applicable to Appellants' demands.

-38-

1    individual arbitrations. Instead, it looked to convert the bilateral arbitration process into a

2    class arbitration process which was strictly prohibited by the arbitration agreement

3    purportedly entered into by the parties. The primary vehicle for its scheme was to

4    advocate that the AAA should hold all Claimants to a special pleading standard, one

5    higher even than the FRCP 12 "plausibility" standard.[44] But Wells Fargo did not stop

6    there, demanding that all past, present, and future Claimants satisfy the higher standard

7    before the AAA would even process a demand for any of them.

8        120.    The Process Arbitrator issued the PA Order, imposing Wells Fargo's

9    proposed heightened pleading requirements, requiring every demand to include: "1)

10   Claimant's Wells Fargo account number for the account at issue, 2) proof that each

11   Claimant was enrolled in DCOS during the time period at issue and 3) proof that each

12   Claimant incurred overdraft fees in connection with transactions covered by Regulation

13   E." More remarkable still, Wells Fargo managed to grind the arbitration proceedings to a

14   halt merely by demanding that Claimants plead this information which was entirely in

15   Wells Fargo's possession already.

16

17   _____

18   [44] Wells Fargo demanded that each filed demand include: "1) Claimant's Wells Fargo

19   account number for the account at issue, 2) facts to establish each Claimant was enrolled

20   in DCOS during the time period at issue and 3) facts sufficient to establish that each

     Claimant incurred overdraft fees in connection with transactions covered by Regulation

21   E" as well as "Amended Claims specifying which state laws have been violated … [and]

     … the specific amount of overdraft fees each Claimant was wrongly charged." *Id.* By

22   contrast, the Rule 12 standard requires a plaintiff to "allege 'enough facts to state a claim

     to relief that is plausible on its face.'" *Taylor v. Yee*, 780 F.3d 928, 935 (9th Cir. 2015)

23   (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Further, the Process

24   Arbitrator was requiring that Claimants' Counsel affirm that the demands were properly

     filed pursuant to California Code of Civil Procedure § 128.7, which only requires that

25   that the allegations and factual contentions made "have evidentiary support or…*are likely

26   to have evidentiary support after reasonable opportunity for further investigation or

     discover*y." Accordingly, the heightened pleading standard of providing substantial

27   evidence at the pleading stage, evidence which was likely to be uncovered after

28   reasonable opportunity for further investigation or discovery, went far beyond what is

     actually required under applicable law to file a pleading.

-39-

121.    The Process Arbitrator also suspended all of Wells Fargo's obligations to pay promised filing fees for all individual Claimants. Without fees, the arbitrations could not progress because no merits arbitrators would be assigned to hold bilateral hearings *See* Supp. Rules MC-7, 10. And even as Wells Fargo consumers continued to submit demands, AAA rejected them by claiming they had not satisfied the PA Order's arbitrary pleading requirements. Through all of this, AAA has never claimed, much less demonstrated, that a single demand has ever failed to satisfy AAA pleading rules. The only source of authority for rejecting these demands for processing is the Process Arbitrator.

122.    The problems described here are further manifest because many of Wells Fargo's overdraft practices can only be addressed by carefully reviewing the monthly statements Wells Fargo prepares for the consumer. And, in the case of Approved-Positive, Post Negative overdraft fees, the review of statements must be accompanied by expert discovery of information that is unilaterally held by the bank and not disclosed to the consumer in any way. Either way, discovery is necessary in order to obtain the information necessary to pursue these claims per the Process Arbitrator's requirements. Yet, the Process Arbitrator refused to require Wells Fargo to produce this information even though she required the information for pleading purposes. And when Claimants requested their statements from Wells Fargo, the bank refused to provide them.  Thus, Plaintiffs and thousands of other putative Class Members have been left in an endless circle that ultimately leaves them without a forum in which to have their claims heard.

123.    But hauling consumers into the mass arbitration described above is an important part of Wells Fargo's litigation strategy because the entire process can be manipulated to prevent consumers from obtaining the necessary discovery to plead their claims. Further, to avoid providing this information, Wells Fargo has hidden behind excuses that it should not have to comply with mass discovery because it's too burdensome.

First Amended Class Action Complaint
Case No. 4:24-cv-00766

124.    But Wells Fargo cannot legally avoid sharing this information, even absent litigation. The CFPB counsels that large banks and credit unions must "comply in a timely manner with consumer requests for information concerning their accounts for consumer financial products and services" or be in violation of Section 1034(c) of the Consumer Financial Protection Act.[45] The rule includes no exceptions for parties that are in litigation, nor does it exclude consumers involved in litigation. It also specifically states that such information is not considered discovery, and as such, is not information that would need to be ruled on by a merits-arbitrator. By forcing consumers into arbitration then preventing them from obtaining information merely because they have made arbitration demands, Wells Fargo puts itself above the law.

125.    Indeed, Wells Fargo's failure to comply with consumer requests for information is itself a violation of federal law, redressable in the individual arbitration the Arbitration Agreement requires. But not only does Wells Fargo refuse to cooperate with information requests from its consumers, AAA justifies Wells Fargo's refusal merely on the basis that Wells Fargo is engaged in what AAA (and Wells Fargo, by design) treat as a collective arbitration.

126.    The cooperation between AAA and Wells Fargo creates a kind of toggle switch Wells Fargo can operate at whim. On one side, Wells Fargo gets the perceived benefits of individual, bilateral arbitration—that is, a class action waiver and the attendant limitation of damages, along with an increase in burdens on the Plaintiffs. But

---

[45] *See* **Exhibit J**, CFPB Advisory Opinion, October 11, 2023, *Consumer Information Requests to Large Banks and Credit Unions* (stating that " Section 1034(c) applies to consumer requests for information concerning an account for a consumer financial product or service"…which encompasses "a wide range of information about a consumer's account. Information concerning an account would *include account information that appears on periodic statements* or on online account portals, such as the amount of the balance in a deposit account, the interest rate on a loan or credit card, and information regarding transactions or payments involving an account") (emphasis added). The Ninth Circuit appeal case, *Alexandria Mosley, et al. v. Wells Fargo & Company, et al.,* No. 23-55478 (9th Cir. 2024), which also involved issues pertaining to Wells Fargo's obligation to provide account information to consumers that it was illegally withholding, was decided without the benefit of briefing on this unequivocal CFPB Order that came out after briefing had concluded.

-41-

when individual, bilateral arbitration becomes inconvenient, expensive, or difficult, Wells Fargo (and AAA) can flip the switch and create something called a "mass arbitration," a collective action arbitrarily defined as those claims that Wells Fargo and AAA will deign to arbitrate, while arbitrarily excluding claims they deem unworthy based on whatever pleading standard they choose to impose.

127.    This is the pretext under which Plaintiffs' claims were dismissed along with thousands of others, as the Process Arbitrator presiding over this "mass arbitration" ordered these claims dismissed because they were supposedly inconsistent with the rules of the "mass arbitration." Supposedly, per the Process Arbitrator, Claimants are also required to limit their claims only to those involving Regulation E, and they must ask permission to amend to add any additional claim *even if their demand included other claims to begin with*. To include any claim other than Regulation E, Claimants (already filed and new) have to plead a Regulation E claim per onerous and improper pleading standards, using information Wells Fargo maintains in its possession but refuses to provide even though required to do so by law to any customer who asks (which they did by providing authorizations to Wells Fargo, which Wells Fargo ignored), meaning anyone with a claim for APSN or representment (which are not related in any way to a Regulation E claim) is apparently out of luck if they also don't have a Regulation E claim.  Per the Process Arbitrator, any attempt to plead other claims was void, simply because the collective "mass arbitration" arbitrarily addressed Regulation E claims only. This is the very definition of arbitrary.

128.    Moreover, given proof of opt-in to Regulation E is required by the Process Arbitrator's pleading standing, any customer who has charges on Regulation E transactions, such as ATM transactions, without being opted-in cannot bring a claim because the violation itself is lack of opt-in into the program. You can't show opt-in if you weren't opted-in, but charging fees on Regulation E transactions in that scenario is still a violation. Numerous attempts were made to explain this to the Process Arbitrator to no avail.

First Amended Class Action Complaint
Case No. 4:24-cv-00766

129.    The same toggle switch also benefits Wells Fargo when it comes to avoiding its information sharing responsibilities under federal law. Rather than be subject to individual, bilateral arbitration, Wells Fargo and AAA subject Claimants to the requirements of the collective "Mass Arbitration." Under these arbitrary rules, AAA not only forbids discovery by individual claimants on a mass basis, it provides cover for Wells Fargo's repeated violations of federal law for refusing to comply with consumer information requests. Many Claimants made such requests because they live far from a branch, lack access to a computer, or their accounts have been closed. Even though they submitted authorization requests, and even though Wells Fargo was required by law to comply, it continually failed to fairly engage in the process. In sheer lawlessness, that same information Wells Fargo illegally withheld was the information the Process Arbitrator deemed necessary to satisfy the imposed heightened pleading standard, and thus move forward in arbitration to be assigned a merits-arbitrator. This merry-go-round of Wells Fargo's abuses is the only reason why Plaintiffs and other Claimants have been denied the right to pursue their claims in arbitration and have been forced to vindicate their rights back in court.  It is not because they do not have a viable claim.

130.    The supposed promise of individual, bilateral arbitration has been shattered beyond repair. Plaintiffs' claims have been dismissed for reasons having nothing to do with their merits, but instead on the basis of an arbitrary set of rules and heightened evidentiary requirements structured to collectively govern thousands of claims, regardless of the promises Wells Fargo made in its agreement. Importantly, simply because Plaintiffs and putative Class Members cannot meet the onerous pleading standards set by the Process Arbitrator does not mean they do not have a claim. It simply means by keeping the information to meet the pleading standard from Plaintiffs and putative Class Members (many of whom have themselves to call or visit a branch to access their statements only to be told no), they can effectively keep them from their day in court.

131.    As a result of this scheme, Wells Fargo gets the benefits of both individual and collective action and Plaintiffs (and thousands of others) are left without a venue for

First Amended Class Action Complaint
Case No. 4:24-cv-00766

their claims. Indeed, Wells Fargo and AAA have dropped even the pretext of hospitability to Plaintiffs' claims, having now arbitrarily dismissed those claims without a substantive reason for doing so.

## VI    CLASS ACTION ALLEGATIONS

132.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

133.    Plaintiffs bring this case, and each of the respective causes of action, as a class action.

134.    The "Class" is composed of one of the following:

The Regulation E Class:

> All customers of Wells Fargo who have or have had accounts with Wells Fargo who were assessed an overdraft fee on a one-time debit card or ATM transaction beginning one-year preceding the filing of the first individual arbitration demand and ending on the date the Class is certified, and whose claims have been dismissed from arbitration without a substantive hearing, or have not yet filed their claim in arbitration. Following discovery, this definition will be amended as appropriate.

The UCL, Section 17200 Class:

> All customers of Wells Fargo who have or have had accounts with Wells Fargo who were assessed an overdraft fee on a one-time debit card or ATM transaction, or were assessed an overdraft fee on a transaction that was authorized on a positive balance and later settled on a negative balance, or who were assessed more than one NSF fee, or an NSF fee followed by an overdraft fee, on the same transaction item, beginning four-years preceding the filing of the first individual arbitration demand and ending on the date the Class is certified, and whose claims have been dismissed from arbitration without a substantive hearing, or have not yet filed their claim in arbitration.  Following discovery, this definition will be amended as appropriate.

The Breach of Contract Class:

> All customers of Wells Fargo who have or had accounts with Wells Fargo who were assessed an overdraft fee on a transaction that was authorized on a positive balance and later settled on a negative balance, or who were assessed more than one NSF fee, or an NSF fee followed by an overdraft fee, on the same transaction item, beginning four-years preceding the filing of the first individual arbitration demand and ending on the date the Class is certified, and whose claims have been dismissed

-44-

First Amended Class Action Complaint
Case No. 4:24-cv-00766

from arbitration without a substantive hearing, or have not yet filed their claim in arbitration. Following discovery, this definition will be amended as appropriate.

135.    Excluded from the Classes are: 1) any entity in which Defendant has a controlling interest; 2) officers or directors of Defendant; 3) this Court and any of its employees assigned to work on the case; and 4) all employees of the law firms representing Plaintiff and the Class Members.

136.    This action has been brought and may be properly maintained on behalf of each member of the Class pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

137.    **Numerosity** – The members of the Class ("Class Members") are so numerous that joinder of all Class Members would be impracticable. While the exact number of Class Members is presently unknown to Plaintiffs, and can only be determined through appropriate discovery, almost 3,500 Claimants were dismissed from arbitration after properly filing demands and Plaintiffs believe based on the percentage of customers that are harmed by these practices with banks and credit unions with similar practices, that the Class is likely to include thousands more.

138.    Upon information and belief, Defendant has databases, and/or other documentation, of its customers' transactions and account enrollment. These databases and/or documents can be analyzed by an expert to ascertain which of Defendant's customers has been harmed by its practices and thus qualify as a Class Member. Further, the Class definitions identify groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover. Other than by direct notice through mail or email, alternative proper and sufficient notice of this action may be provided to the Class Members through notice published in newspapers or other publications.

139.    **Commonality** – This action involves common questions of law and fact. The questions of law and fact common to both Plaintiffs and the Class Members include, but are not limited to, the following:

- Whether Defendant used the available balance for making a

-45-

determination of whether to assess overdraft fees on one-time debit card and ATM transactions;

- Whether the opt-in disclosure agreement Defendant used to opt-in Class Members violated the mandate of Regulation E that the opt-in disclosure agreement must accurately, clearly, and in an easily understandable way describe the overdraft services of Defendant;

- Whether Defendant violated Regulation E by failing to provide an opt-in disclosure agreement that was "substantially similar" to the Model A-9 form, and did not include information not authorized by the regulation;

- Whether Defendant violated Regulation E by not obtaining Class Members' affirmative consent to enroll in its overdraft services separately from all other acknowledgements;

- Whether Defendant violated Regulation E by failing to provide Class Members with a reasonable opportunity to affirmatively consent prior to being charged overdraft fees on one-time debit card and ATM transactions by allowing Class Members to opt into DCOS based on a verbal pitch by Defendant's employees;

- Whether Defendant violated Regulation E by failing to provide Class Members with written confirmation of their consent to opt-in, as well as right to revoke that consent;

- Whether Defendant violated Regulation E when it assessed overdraft fees on one-time debit card and ATM transactions against Class Members;

- Whether Defendant's conduct in violating Regulation E also violated the Section 17200;

- Whether Defendant's practices of assessing APSN overdraft fees and representment fees violate Section 17200;

-46-

- Whether Defendant's practices of assessing APSN and representment fees violate its applicable contracts and disclosures; and

- Whether Defendant continues to violate Regulation E and Section 17200 by not opting in (or not re-opting in) customers and the public using an opt-in disclosure agreement and/or opt-in practices that do not violate Regulation E but continuing to them overdraft fees on one-time debit card and ATM transactions based on an opt-in disclosure agreement and practices that violate Regulation E.

140. **Typicality** – Plaintiffs' claims are typical of all Class Members. The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiffs and all of the Class Members are substantially the same because the Account Agreement and opt-in disclosure agreement was the same, the opt-in procedures were the same, the fee assessment processes were the same, and all were dismissed by AAA from arbitration, or will be dismissed by AAA if filed, even though they initially met or would meet AAA's filing requirements until Wells Fargo convinced AAA to change them. Accordingly, in pursuing their own self-interest in litigating their claims, Plaintiffs will also serve the interests of the other Class Members and the general public.

141. **Adequacy** – Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained competent counsel experienced in class action litigation, and specifically financial institution overdraft cases to ensure such protection. There are no material conflicts between the claims of the representative Plaintiffs and the members of the Class that would make class certification inappropriate. Plaintiffs and counsel intend to prosecute this action vigorously.

142. **Predominance and Superiority** – The matter is properly maintained as a class action because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class Members. Further, the class action is superior to all other available methods for the

-47-

fair and efficient adjudication of this matter. Because the injuries suffered by the individual Class Members are relatively small compared to the cost of the litigation, the expense and burden of individual litigation would make it virtually impossible for Plaintiffs and Class Members to individually seek redress for Defendant's wrongful conduct. Even if any individual person or group(s) of Class Members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court. In contrast, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, Plaintiffs and the Class Members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of its ill-gotten gains.

143.    Plaintiffs do not believe that any other Class Members' interests in individually controlling a separate action are significant, in that Plaintiffs have demonstrated above that their claims are typical of the other Class Members and that they will adequately represent the Class. This particular forum is desirable for this litigation because Plaintiff's claims arise from activities that occurred largely therein. Plaintiffs do not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

144.    Plaintiffs anticipate the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class Members. Upon information and belief,

First Amended Class Action Complaint
Case No. 4:24-cv-00766

Defendant's own business records and/or electronic media can be utilized for the contemplated notices. To the extent that any further notices may be required, Plaintiffs anticipate using additional media and/or mailings.

145. This matter is properly maintained as a class action pursuant to Fed. R. Civ. P. 23 in that without class certification and determination of declaratory, injunctive, statutory and other legal questions within the class format, prosecution of separate actions by individual members of the Class will create the risk of:

- inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

- adjudication with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

- the interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

- the extent and nature of any litigation concerning the controversy already commenced by or against members of the Class;

- the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and the difficulties likely to be encountered in the management of a class action.

146. Wells Fargo has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final declaratory and injunctive relief with respect to the class as a whole under Federal Rule of Civil Procedure 23(b)(2). The Court should

First Amended Class Action Complaint
Case No. 4:24-cv-00766

order Wells Fargo to cease charging overdraft fees to its customers who were purportedly opted into DCOS using a non-compliant disclosure agreement, unless and until Wells Fargo opts-in customers using a compliant disclosure agreement. The Court should also order Wells Fargo to cease assessing its customers overdraft fees on ATM transactions if they have not been properly opted-in and should cease charging customers fees on APSN and representment transactions.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### (Violation of Regulation E)

147.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

148.    By charging overdraft fees on ATM and non-recurring debit card transactions, Defendant violated Regulation E, 12 C.F.R. §§ 1005, *et seq*., whose "primary objective" is "the protection of individual consumers," 12 C.F.R. § 1005.1(b), and which "carries out the purposes of the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693, *et seq*., the 'EFTA,'" 12 C.F.R. § 1005.1(b)).

149.    Specifically, the charges violated what is known as the "Opt In Rule" of Regulation E.  12 C.F.R. § 1005.17.  The Opt In Rule states:  "a financial institution . . . *shall not assess a fee or charge* . . . pursuant to the institution's overdraft service, *unless* the institution:  (i) [p]rovides the consumer with a notice in writing [the opt-in notice] . . . *describing the institution's overdraft service*" and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program.  *Id*. (emphasis added).  The notice "shall be clear and readily understandable." 12 C.F.R. § 1005.4(a)(1).  To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide a reasonable opportunity to opt-in after receiving the description. The affirmative consent must be provided in a way mandated by 12 C.F.R. §

First Amended Class Action Complaint
Case No. 4:24-cv-00766

1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17. Furthermore, choosing not to "opt-in" cannot adversely affect any other feature of the account.

150.    The intent and purpose of this opt-in disclosure agreement is to "assist customers in understanding how overdraft services provided by their institutions operate . . . by explaining the institution's overdraft service . . . in a clear and readily understandable way"—as stated in the Official Staff Commentary, 74 Fed. Reg. 59033, 59035, 59037, 5940, 5948, which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E. *Strubel v. Capital One Bank (USA)*, 179 F. Supp. 3d 320, 324 (S.D.N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z).

151.    Defendant failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires affirmative consent before a financial institution may assess overdraft fees against customers' accounts through an overdraft program for ATM withdrawals and non-recurring debit card transactions. Defendant has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers in a "clear and readily understandable way" a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17. Defendant has selected an opt-in method that fails to satisfy 12 C.F.R. § 1005.17 because, *inter alia*, it states in the non-conforming disclosure agreement that an overdraft occurs when there is not enough money in the account to cover a transaction, but Defendant pays it anyway. But, in fact, Defendant assesses overdraft fees even when there is enough money in the account to pay for the transaction and Defendant needs to advance no funds at all. This is accomplished by using the internal bookkeeping available balance to assess overdraft fees, rather than the actual and official balance of the account. Defendant failed to use language to describe the overdraft service that identified that it was using the available balance to assess overdraft fees,

First Amended Class Action Complaint
Case No. 4:24-cv-00766

which meant that in a significant percentage of the transactions that were the subject of the overdraft fee, there was money in the account to cover the transaction and Defendant did not have to advance any money – yet Defendant assessed an overdraft fee anyway.

152.    Defendant also failed to provide its opt-in disclosure agreement as a stand-alone form that was "substantially similar" to the Model A-9 form, by including it in a brochure along with other documents and disclosures. Further, based on information and belief, Defendant did not show the form to customers prior to opting them in, instead relying on employees' unscripted verbal description of the program to then enroll customers. Wells Fargo also appears to be charging overdraft fees on ATM transactions for customers who are not opted-in to the program. Defendant thus failed to obtain Class Members' affirmative consent prior to charging them overdraft fees on one-time debit card and ATM transactions. Finally, Defendant failed to provide Class Members with written confirmation of their consent to opt-in, as well as the right to revoke such consent.

153.    As a result of violating Regulation E's prohibition against assessing overdraft fees on ATM and non-recurring debit card transactions absent a compliant disclosure agreement and compliant opt-in procedures, Defendant was not and is not legally permitted to assess any overdraft fees on one-time debit card or ATM transactions, and it has harmed Plaintiffs and the Class Members by assessing overdraft fees on one-time debit card and ATM transactions.

154.    As the result of Defendant's violations of Regulation E, 12 C.F.R. § 1005, *et seq.*, Plaintiffs and members of the Class are entitled to actual damages, statutory damages, as well as attorneys' fees and costs of suit, pursuant to 15 U.S.C. § 1693m.

## SECOND CAUSE OF ACTION

### (Violation of California Unfair Competition Law, Business & Professions Code Section 17200, *et seq.*)

155.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

-52-

156.    Defendant's conduct described herein violates California's Unfair Competition Law (the "UCL"), codified at Business and Professions Code section 17200, *et seq*. The UCL prohibits, and provides civil remedies for, unfair competition. Its purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language. By defining unfair competition to include any "any unlawful, unfair or fraudulent business act or practice," the UCL permits violations of other laws to serve as the basis of an independently actionable unfair competition claim, and sweeps within its scope acts and practices not specifically proscribed by any other law.

157.    The UCL expressly provides for injunctive relief, and contains provisions denoting its public purpose. A claim for injunctive relief under the UCL is brought by a plaintiff acting on behalf of the general public. Although the private litigant controls the litigation of an unfair competition claim, he or she is not entitled to recover compensatory damages for his or her own benefit, but only disgorgement of profits made by the defendant through unfair competition in violation of the statutory scheme, or restitution to victims of the unfair competition.

158.    As further alleged herein, Defendant's conduct violates the UCL's "unlawful" prong because that conduct violates public policy and/or the text of Regulation E. Defendant's conduct was not motivated by any legitimate business or economic need or rationale. The harm and adverse impact of Defendant's conduct on members of the general public was neither outweighed nor justified by any legitimate reasons, justifications, or motives. The harm to Plaintiffs and Class Members arising from Defendant's unlawful practices relating to the imposition of the improper fees outweighs the utility, if any, of those practices.

159.    Defendant's unlawful business practices as alleged herein are immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and Class Members, and the general public. Defendant's conduct was

First Amended Class Action Complaint
Case No. 4:24-cv-00766

substantially injurious to Plaintiffs and the Class Members as they have been forced to pay millions of dollars in improper fees, collectively.

160.  Moreover, as described herein, Defendant's conduct also violates the UCL's "unfairness" prong by assessing fees in violation of Regulation E, and charging fees on APSN and representment transactions.

161.  As a direct and proximate result of Defendant's violations of the UCL, Plaintiffs and Class Members have been assessed improper and illegal overdraft and NSF fees, and Defendant has received, or will receive, income, profits, and other benefits, which it would not have received if it had not engaged in the violations of Section 17200 described in this Complaint.

162.  Further, absent injunctive relief forcing Defendant to disgorge itself of its ill-gotten gains and injunctive relief prohibiting Defendant from continuing to charge unlawful and unfair overdraft and NSF fees. Defendant must also be required to immediately stop charging illegal overdraft fees unless and until it re-opts-in current customers using a Regulation E complaint opt-in disclosure agreement and process, Plaintiffs and other existing accountholders, and the general public, will suffer from and be exposed to Defendant's conduct violative of the UCL.

163.  Plaintiffs request that they be awarded all other relief as may be available by law, pursuant to California Business & Professions Code § 17203, including an order of this court compelling Defendants to cease all future unlawful and unfair business practices related to its overdraft and NSF practices, including its practice of charging overdraft fees on Regulation E transactions absent a compliant opt-in disclosure agreement and opt-in procedures, as well as charging APSN and representment fees.

## THIRD CAUSE OF ACTION
### (Breach of Contract)

164.  Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

First Amended Class Action Complaint
Case No. 4:24-cv-00766

165.    Plaintiffs and Class Members entered into Deposit Account Agreements constituting the relevant contracts with Defendant covering the terms and conditions of their consumer accounts. This contract was drafted by and binds Defendant.

166.    By the contract's own terms, if an item was returned based on insufficient funds, only one NSF fee would be assessed, regardless of the number of times the same item was resubmitted by the merchant. Specifically, the contract states that, "if an item is returned for insufficient funds, [Wells Fargo] may assess *a returned item fee*." (emphasis added).

167.    Despite contractual language clearly indicating that for each item only one singular NSF fee may be assessed, Defendant routinely charged multiple NSF fees for the same transaction item in violation of its contract and disclosures.

168.    In addition, Defendant's contract also discloses that overdrafts would be assessed only when a consumer's account lacked sufficient available funds. Specifically, it states that, "if the available balance in your account is not enough to pay all of your transactions, we will take the following steps….and decide whether to pay your transaction into overdraft or return it unpaid." It also states that, "if your account has *insufficient funds as reflected by your available balance,* the Bank may assess overdraft and/or non-sufficient funds (NSF) fees") (emphasis added). Finally, it states that "Debit Card Overdraft Service allows Wells Fargo to approve (at our discretion) your ATM and everyday (one-time) debit card transaction(s) *if you do not have enough money in your checking account or in accounts linked for Overdraft Protection at the time of the transaction*." (emphasis added).

169.    However, Defendant assessed overdraft fees to Plaintiffs and Class Members when their accounts had available funds by charging APSN fees. Specifically, the transactions at issue were authorized on a positive available balance, but later settled on a negative available balance. However, by charging overdraft fees on transactions that were authorized when Plaintiffs and Class Members had sufficient available funds, regardless of whether those transactions settled negative days later, Defendant violated its contract.

First Amended Class Action Complaint
Case No. 4:24-cv-00766

170.   As a direct and proximate cause of Defendant's breach of contract, Plaintiffs and Class Members have incurred wrongful NSF and overdraft fees.

171.   Plaintiffs and all Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of Defendant's contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

172.   As a direct and proximate result of Defendant's material breaches, Plaintiffs and Class Members have been damaged by assessment of wrongful fees in an amount to be proven at trial, and seek relief as set forth in the Prayer below.

## FOURTH CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

173.   The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

174.   Plaintiffs and each of the Class Members entered into the Account Agreement with Defendant covering the subject of overdraft and NSF transactions. The Account Agreement was drafted by and is binding upon Defendant. In the Agreement, Defendant promised that it would only assess overdraft or NSF fees when there was not enough money in the account to cover the transaction. Yet Defendant assessed such fees when Plaintiff and Class Members had enough money in the account to cover the transaction. Defendant also promised that it would only charge a single NSF fee for an item, when in reality Defendant assessed NSF and/or overdraft fees multiple times for the same electronic item.

175.   Further, good faith is an element of every contract. Whether by common law or statute, all contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Thus, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of

First Amended Class Action Complaint
Case No. 4:24-cv-00766

the bargain and abusing the power to specify terms, constitute examples of bad faith in the performance of contracts.

176.    The material terms of the Account Agreement therefore include the implied covenant of good faith and fair dealing, whereby Defendant covenanted that it would, in good faith and in the exercise of fair dealing, deal with Plaintiff and each Class Member fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiff and the Class Members' rights and benefits under the contracts.

177.    Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contracts, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

178.    Defendant breached the implied covenant of good faith and fair dealing based, *inter alia*, on its practices of assessing fees when there was enough money in the account to cover the transaction.  Defendant could easily have avoided acting in this manner by simply changing the programming in its software to charge overdraft and NSF fees only when there really was not enough money in the account to cover the transaction in question and to only charge a fee once per item.  Instead, Defendant unilaterally elected to and did program its software to maximize its overdraft by assessing overdraft fees on transactions that were authorized with a positive balance, but later settled with a negative balance.  It also programmed the software to charge multiple fees each time the same item was represented for payment by a merchant.  In so doing, and in implementing its overdraft and NSF fee programs for the purpose of increasing and maximizing overdraft and NSF fees, Defendant executed its contractual obligations, including any discretion it had, in bad faith, depriving Plaintiffs and the Class Members of the full benefit of the Account Agreement.

179.    As a proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiffs and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

First Amended Class Action Complaint
Case No. 4:24-cv-00766

1
2

## FIFTH CAUSE OF ACTION
### (Unjust Enrichment/Restitution)

3    180.    The preceding allegations are incorporated by reference and re-alleged as if
4    fully set forth herein.

5    181.    As a result of the wrongful misconduct alleged above, Defendant unjustly
6    received millions of dollars in overdraft and NSF fees.

7    182.    Plaintiffs and the Class Members have no adequate remedy at law to
8    compensate them for this harm. Although Plaintiffs and the Class Members have asserted
9    breach of contract damages, such damages may not fully compensate them for their harm,
10    or such damages may not be as efficient and practical. Thus, they seek equitable relief as
11    an alternative to money damages.

12    183.    Because Plaintiffs and the Class Members paid the erroneous overdraft and
13    NSF fees assessed by Defendant, Plaintiffs and the Class Members have conferred a
14    benefit on Defendant, albeit undeservingly. Defendant has knowledge of this benefit, as
15    well as the wrongful circumstances under which it was conveyed, and yet has voluntarily
16    accepted and retained the benefit conferred. Should it be allowed to retain such funds,
17    Defendant would be unjustly enriched. Therefore, Plaintiffs and the Class Members seek
18    relief as set forth in the Prayer below.

19

## SIXTH CAUSE OF ACTION
### (Money Had and Received)

20

21    184.    The preceding allegations are incorporated by reference and re-alleged as if
22    fully set forth herein.

23    185.    Defendant has obtained money from Plaintiffs and the Class Members by the
24    exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of
25    law and/or fact.

26    186.    Plaintiffs and the Class Members have no adequate remedy at law to
27    compensate them for this harm. Although Plaintiffs and the Class Members have asserted
28    breach of contract damages, such damages may not fully compensate them for their harm,

-58-

1    or such damages may not be as efficient and practical. Thus, they seek equitable relief as

2    an alternative to money damages.

3        187.    As a result, Defendant has in its possession money which, in equity, belongs

4    to Plaintiffs and the Class Members, and thus, this money should be refunded to Plaintiffs

5    and the Class Members.  Therefore, Plaintiffs and the Class Members seek relief as set

6    forth in the Prayer below.

7                        **VII    PRAYER FOR RELIEF**

8        WHEREFORE, Plaintiffs and the Class pray for judgment as follows:

9            a.    for an order certifying this action as a class action;

10           b.    for an order enjoining the unlawful conduct alleged herein;

11           c.    for actual damages;

12           d.    for statutory damages under Regulation E;

13           e.    for restitution;

14           f.    for injunctive relief;

15           g.    for pre-judgment and post-judgment interest as provided by law;

16           h.    for costs;

17           i.    for attorneys' fees under the Electronic Fund Transfer Act, the

18   common fund doctrine, and all other applicable law; and

19           j.    for such other relief as the Court deems just and proper.

20

21   Dated: April 26, 2024            Respectfully Submitted,

22

                                     */s/* Richard D. McCune
23                                   Richard D. McCune (State Bar No. 132124)
                                     rdm@mccunewright.com
24                                   Steven A. Haskins (State Bar No. 238865)
                                     sah@mccunewright.com
25                                   Valerie L. Savran (State Bar No. 334190)
                                     vls@mccunewright.com
26                                   **MCCUNE LAW GROUP, APC**
                                     3281 E. Guasti Road, Suite 100
27                                   Ontario, California 91761
                                     Telephone:  (909) 557-1250
28                                   Facsimile:   (909) 557 1275

---

-59-

First Amended Class Action Complaint
Case No. 4:24-cv-00766

Emily J. Kirk (IL Bar No. 6275282)*
ejk@mccunewright.com
**MCCUNE LAW GROUP, APC**
231 N. Main Street, Suite 20
Edwardsville, IL 62025
Telephone:  (618) 307-6116
Facsimile:   (618) 307-6161

Attorneys for Plaintiffs and the Putative Class

*Pro Hac Vice* application to be submitted

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class Members demand a trial by jury on all issues so triable.

Dated: April 26, 2024                    Respectfully Submitted,

/s/ Richard D. McCune
Richard D. McCune (State Bar No. 132124)
rdm@mccunewright.com
Steven A. Haskins (State Bar No. 238865)
sah@mccunewright.com
Valerie L. Savran (State Bar No. 334190)
vls@mccunewright.com
**MCCUNE LAW GROUP, APC**
3281 E. Guasti Road, Suite 100
Ontario, California 91761
Telephone:  (909) 557-1250
Facsimile:   (909) 557 1275

Emily J. Kirk, IL Bar No. 6275282*
ejk@mccunewright.com
**MCCUNE LAW GROUP, APC**
231 N. Main Street, Suite 20
Edwardsville, IL 62025
Telephone:  (618) 307-6116
Facsimile:   (618) 307-6161

Attorneys for Plaintiffs and the Putative Class

*Pro Hac Vice* application to be submitted

-60-

First Amended Class Action Complaint
Case No. 4:24-cv-00766