Richard D. McCune (State Bar No. 132124)
rdm@mccunewright.com
Steven A. Haskins (State Bar No. 238865)
sah@mccunewright.com
Valerie L. Savran (State Bar No. 334190)
vls@mccunewright.com
**McCUNE LAW GROUP, APC**
3281 E. Guasti Road, Suite 100
Ontario, California 91761
Telephone:(909) 557-1250
Facsimile:(909) 557 1275

Emily J. Kirk (IL Bar No. 6275282) *
ejk@mccunewright.com
**McCUNE LAW GROUP, APC**
231 N. Main Street, Suite 20
Edwardsville, IL 62025
Telephone: (618) 307-6116
Facsimile: (618) 307-6161

*Attorneys for Plaintiffs and
the Putative Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW PENUELA, KOUSHIK CHARAN, JILL MOLARIS, MARIA SMYTHE, JESSICA WILLSHIRE, and DAYMOND WALTON, individually, and on behalf of all others similarly situated, | Case No.: 4:24-cv-00766-KAW |
| | **OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION** |
| Plaintiffs, | |
| v. | Complaint Filed: February 8, 2024 |
| WELLS FARGO BANK, N.A., WELLS FARGO & CO., and DOES 1 through 5, inclusive, | Hon. Kandis A. Westmore |
| Defendants. | |

# TABLE OF CONTENTS

*Page*

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF FACTS .................................................................................. 1

    A.    The Contractual Relationship Between Wells Fargo and Consumers ......... 2

    B.    Wells Fargo's Unfair and Deceptive Overdraft Practices ........................... 2

    C.    Plaintiffs Have Been Charged Unfair and Deceptive Overdraft Fees Without Their Knowing Consent ................................................................ 4

    D.    Plaintiffs Sought to Arbitrate Their Claims Against Wells Fargo Pursuant to the Arbitration Agreement ...................................................... 5

    E.    After the Mosley Litigation Was Dismissed, the Process Arbitrator Dismissed Plaintiffs' Claims ...................................................................... 9

    F.    Wells Fargo's History of Animus Against MLG ....................................... 11

III.  LEGAL STANDARD ......................................................................................... 13

IV.   ARGUMENT ..................................................................................................... 13

    A.    Plaintiffs' Claims Were Dismissed in a "Final and Binding" Order Resulting from a Collective Arbitration Process ....................................... 14

    B.    Wells Fargo Has Breached the Arbitration Agreement by Failing to Provide Plaintiffs with an Efficient, Individualized, or Neutral Dispute Resolution Forum ........................................................................ 15

    C.    Plaintiffs Did Not Receive the "Quick" or "Streamlined" Arbitrationthe Account Agreement Promised ................................................................... 16

    D.    Plaintiffs' Claims Were Dismissed Based on Collective Procedures Applied to Multiple Claims, Untethered from Individual Circumstances . 17

    E.    Claimants Were Not Given the Neutral Arbitrator Promised in the Deposit Agreement ................................................................................... 19

V.    CONCLUSION ................................................................................................... 23

Opposition to Defendants' Motion to Compel Arbitration
Case No. 4:24-Cv-00766-KAW

# TABLE OF AUTHORITIES

*Page(s)*

Cases

*Boardman v. Pacific Seafood Grp.*,
    822 F.3d 1011 (9th Cir. 2016) ........................................................................... 13

*Lamps Plus, Inc. v. Varela*,
    578 U.S. 176 (2019) ........................................................................................... 18

*Michigan Mutual Ins. Co. v. Unigard Sec. Ins. Co.*,
    44 F.3d 826 (9th Cir. 1995) ............................................................................... 15

*Millmen Local 550, United Broth. Of Carpenters and Joiners of Am., AFL-CIO v. Wess Exterior Trim*,
    828 F.2d 1373 (9th Cir. 1987) ........................................................................... 14

*Mosley v. Wells Fargo & Company*,
    No. 22-CV-01976-DMS-AGS, 2023 WL 3185790 (S.D.Cal. May 1, 2023) ...... 9

*Mosley v. Wells Fargo & Company*,
    No. 23-55478, 2024 WL 977674 (9th Cir. Feb. 15, 2024) ............................ 9, 14

*Shivkov v. Artex Risk Solutions, Inc.*,
    974 F.3d 1051 (9th Cir. 2020) ........................................................................... 17

*Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp.*,
    559 U.S. 662 (2010) ........................................................................................... 17

Statutes

9 U.S.C. § 2 ............................................................................................................... 13

12 U.S.C. § 5533(c) .................................................................................................... 7

12 U.S.C. § 5534(c)(1) ............................................................................................... 7

Cal. Code Civ. Proc. § 128.7 ...................................................................................... 6

Opposition to Defendants' Motion to Compel Arbitration
Case No. 4:24-Cv-00766-KAW

## I.    INTRODUCTION

For several years now, Plaintiffs have been locked into a Groundhog Day scenario, unable to obtain the individual arbitration hearings they were promised by Wells Fargo when they waived away their substantive rights to a jury trial, protective class procedures, and any judicial means by which they might receive a fair hearing on their claims. Instead, Wells Fargo and AAA colluded to prevent Plaintiffs from obtaining any substantive hearing at all.

Unsurprisingly, Wells Fargo's solution for all of this is more of the same: return Plaintiffs to arbitration for more of the same neglect and mistreatment they experienced before filing this lawsuit. But, by now, what was once obvious to only Plaintiffs should now be obvious to everyone, including this Court: Wells Fargo does not intend to allow Plaintiffs to have their day in a neutral forum. Given Wells Fargo's broken contractual promises, the Court should deny the motion to compel arbitration and, finally, once and for all, permit Plaintiffs to bring their claims in a forum which will at least give them a chance to obtain relief for their claims.

## II.    STATEMENT OF FACTS

As Wells Fargo notes, the Southern District of California has ruled on a case related to disputes between consumers and Wells Fargo about their arbitration agreements. In *Mosley v. Wells Fargo & Co.*, 22-CV-1976 BEN-AGS, the plaintiffs filed a lawsuit for a declaratory judgment that Wells Fargo had violated the terms of its contracts with the plaintiffs by failing to provide an appropriate forum for addressing their claims. In response to the lawsuit, Wells Fargo filed a motion to dismiss the claims and a motion to compel Plaintiffs back into the arbitral forum. In May 2023, Judge Dana Sabraw issued an order compelling Plaintiffs to arbitration and dismissing the case.

But after Judge Sabraw issued his order, the arbitration process continued, resulting in a "Process Arbitrator" substantively dismissing thousands of claimants. As a result, Plaintiffs never received the individual merits arbitration Wells Fargo had promised. Moreover, the only process they received was a collective process that ended in dismissal of several thousand complaints in a single order, the antithesis of what Plaintiffs had been promised. And while Judge Sabraw dismissed *Mosley*, sending it back to arbitration because the Process Arbitrator's order was not a

Opposition to Defendants' Motion to Compel Arbitration
Case No. 4:24-Cv-00766-KAW

reviewable "final" order, subsequent proceedings have since changed Plaintiffs' fortunes for the worse. Therefore, Plaintiffs again seek a legal forum to hear their claims that they have been heretofore denied.

## A.      The Contractual Relationship Between Wells Fargo and Consumers

Wells Fargo offers checking accounts used by consumers to deposit and withdraw money. These accounts are governed by terms set forth in a document Wells Fargo calls the Deposit Account Agreement (the "Account Agreement"). Dkt No. 21-1, pp. 63-102. Within the Account Agreement, Wells Fargo has inserted an arbitration agreement ("Arbitration Agreement"), which requires either party to submit claims to the American Arbitration Association ("AAA") for administration under AAA's Consumer Arbitration Rules ("Consumer Rules"). *Id.* at 97-98.

The Arbitration Agreement promised material benefits to accountholders who agreed to binding arbitration. For instance, accountholders were promised access to a claim-resolution process able to resolve their disputes "as quickly and easily as possible" and in a "more streamlined, cost-effective manner than a typical court case." *Id.* These promises were material because in return for accountholders having access to this "quick," "easy," "streamlined," cost-effective" process, Wells Fargo required them to waive their rights to pursue traditional litigation; in particular, the right to participate in a class or collective action in any forum. *Id.* The Arbitration Agreement did carve out certain exceptions. For example, the parties were permitted to seek "provisional and ancillary remedies such as injunctive relief" in a "court of competent jurisdiction." *Id.*

## B.      Wells Fargo's Unfair and Deceptive Overdraft Practices

Each Plaintiff has served AAA with claims relating to Wells Fargo's overdraft fee practices. Overdraft fees have long been a matter of concern to financial regulators, because banks and other financial institutions have the leverage to aggressively charge high overdraft fees to low-income consumers, with minimal risk.[1] Because of these concerns, the Federal Reserve

---

[1] *See* FDIC, Consumer Compliance Supervisory Highlights, June 2019, available at https://www.fdic.gov/regulations/examinations/consumercomplsupervisoryhighlights.pdf; *see*

1    has adopted Regulation E to govern the assessment of overdraft fees on one-time debit card and

2    ATM transactions, and the Consumer Financial Protection Bureau ("CFPB") recently issued

3    updated and renewed guidance regarding when and how financial institutions may charge

4    overdraft fees.[2]

5           Wells Fargo has administered overdraft fees in multiple unfair and deceptive ways. First,

6    Plaintiffs allege that Wells Fargo's practices on one-time debit card and ATM transactions failed

7    to satisfy Regulation E requirements. Dkt. No. 1, ¶¶ 2-4. These failures caused customers both

8    informational and out-of-pocket harm. Wells Fargo used an eight-page marketing overdraft

9    brochure as its purported "opt-in" disclosure agreement, violating Regulation E's mandate that

10   information about overdraft fees be disclosed in a one-page form substantially similar to the

11   Federal Reserve's model form. *Id.*, ¶¶ 70-71. While one page of Wells Fargo's eight-page form

12   included disclosures similar to those found in the model form, they were not arranged in a

13   standalone document or segregated from other information. Instead, it was combined with

14   information intended to convince consumers to enroll in Wells Fargo's Debit Card Overdraft

15   Service ("DCOS") program, which is also a violation of Regulation E. *Id.*, ¶¶ 70-72.

16          Nor did Wells Fargo provide the eight-page brochure to customers as a standalone

17   document. Instead, customers were directed to a new account folder including the Account

18   Agreement, privacy notice, fee schedule and other documents. *Id.*, ¶ 73. These documents were

19   not provided to a new customer until after a Wells Fargo employee verbally described DCOS (a

20   practice recently condemned by the CFPB)[3] and asked customers if they wanted to enroll. *Id.*, ¶

21   72. Wells Fargo allowed employees to urge DCOS upon accountholders without a script, and

22

23   _____

24   *also* CFPB, CFPB Finds Small Debit Purchases Lead to Expensive Overdraft Charges, July 31, 2014, *available at* https://www.consumerfinance.gov/about-us/newsroom/cfpb-finds-small-

25   6debit-purchases-lead-to-expensive-overdraft-charges/ (last visited Jan. 30, 2024)
     [2] *See* CFPB, Supervisory Highlights Junk Fees Update Special Edition, October 2023,

26   available at (consumerfinance.gov); *see also* CFPB, CFPB Orders Atlantic Union Bank to Pay $6.2 Million for Illegal Overdraft Fee Harvesting, Dec. 7, 2023, available at

27   http://www.consumerfinance.gov/about-us/newsroom/cfpb-orders-atlantic-union-bank-to-pay-6-2-million -for-illegal-overdraft-fee-harvesting.

28   [3] Dkt. No. 1, fn.11.

Opposition to Defendants' Motion to Compel Arbitration
Case No. 4:24-Cv-00766-KAW

Wells Fargo encouraged consumers to enroll without obtaining signatures or other recorded affirmation by the consumer, which is yet another violation of Regulation E. *Id.* It also failed to provide the necessary disclosures until after customers had already been enrolled into the program. *Id.*, ¶ 71.

In addition to flouting Regulation E, Wells Fargo has also engaged in additional conduct constituting unfair and deceptive business practices. First, it has improperly charged multiple fees for the same electronic transaction or item ("representment fees"). When a consumer triggered a payment and Wells Fargo determined that insufficient funds existed to cover the transaction, it charged a $35 Non-Sufficient Funds ("NSF" fee and rejected the transaction. *Id.*, ¶ 82. If the payee (not the consumer) presented the same item for processing again, and there still was still a shortage in the account, Wells Fargo would again deny the transaction and charge an additional $35 fee. *Id.* Wells Fargo would then repeat the process as often as the item was re-presented, even though the consumer had triggered just a single transaction and could not prevent the representment.

Similarly, Wells Fargo charges overdraft fees on so-called "APSN transactions." *Id.*, ¶ 83. These transactions occur when the bank authorizes a transaction with a positive account balance. In such cases, a temporary authorization hold is placed on the account for the transaction amount. *Id.* But intervening transactions may post in the interim, causing the account to go negative before the transaction posts to the account. Instead of using the "held" funds to pay the transaction, Wells Fargo looks at the account balance as a whole and if it is negative at the time of posting, an overdraft fee is charged even though the transaction was approved when the account balance was positive and the bank purportedly held the funds to cover it. *Id.*

C.     **Plaintiffs Have Been Charged Unfair and Deceptive Overdraft Fees Without Their Knowing Consent**

Each of the named Plaintiffs has been charged an overdraft fee by Wells Fargo. On January 19, 2022, Mr. Penuela was assessed two $35 overdraft fees on two separate ATM withdrawals made on that day. *Id.*, pp. 58-59. On September 16, 2021, Mr. Charan made numerous transactions that Wells Fargo appears to have authorized on a positive balance, but due

4

to intervening transactions occurring prior to posting, the balance had gone negative by the time the transactions posted resulting in the improper assessment of overdraft fees. Dkt. No. 14, ¶ 45. Ms. Molaris was assessed two $35 overdraft fees on two separate one-time debit card transactions made on February 11, 2022, and a single $35 overdraft fee on a separate February 13, 2022 ATM withdrawal. *Id.*, ¶ 46. Ms. Smythe was assessed several $35 NSF and overdraft fees for a single transaction item in October 2021. *Id.,* ¶ 47. Ms. Willshire was assessed a $35 NSF fee and an additional $35 overdraft fee on a single transaction item in November 2021. *Id.,* ¶ 48. And Mr. Walton was assessed multiple $35 NSF fees on a single July 2021 transaction. *Id.,* ¶ 49.

**D.**    **Plaintiffs Sought to Arbitrate Their Claims Against Wells Fargo Pursuant to the Arbitration Agreement**

Each Plaintiff initiated the arbitration process against Wells Fargo by serving a claim upon AAA. Dkt. No. 21-1, pp. 54-352. The operative rule for serving a claim is found in Rule 2 of AAA's Consumer Arbitration Rules, which are the rules cited in the Arbitration Agreement. AAA Consumer Arbitration Rule 2(a)(1) (2014). Rule 2 states that for AAA to consider a demand actionable, it must (1) briefly explain the dispute; (2) list the names and addresses of the consumer and the business and, if known, the names of any representatives of the consumer and the business; (3) specify the amount of money in dispute, if applicable; (4) identify the requested location for the hearing if an in-person hearing is requested; and (5) state the claimant's desired relief. *Id.*

Plaintiffs are just a few of thousands of individuals who have served arbitration demands upon Wells Fargo since early 2022, many of which involve how and when Wells Fargo imposes overdraft fees. In many, if not all, of these cases, the claimants are represented by McCune Law Group ("MLG"), as is each Plaintiff here. Dkt. No. 14, ¶¶ 101-109. Plaintiffs filed their arbitration demands on dates ranging from April 13, 2022 to August 30, 2022. *Id.* In each case, arbitration was demanded on the basis that Wells Fargo's overdraft practices were unlawful, specifying two types of claims: (1) Wells Fargo's alleged violations of Regulation E and (2) its unlawful business practices were barred by consumer protection statutes in each Plaintiff's home state. *Id.*

Opposition to Defendants' Motion to Compel Arbitration
Case No. 4:24-Cv-00766-KAW

Subsequent to service of each Plaintiff's claim, AAA sent a notice affirming that each Plaintiff (and the other Claimants) had complied with the filing requirements, and thus AAA was initiating individual arbitration proceedings, beginning with the appointment of a merits arbitrator. *See, e.g.*, Dkt. No. 21-1, p. 354. As part of Wells Fargo's contractual responsibility, it was supposed to pay the initial costs of the arbitration after claimants paid their initial filing fees. *Id.* at pp. 97-98. Plaintiffs here each paid the necessary fees. *See* Declaration of Richard D. McCune ("McCune Decl."), Ex. 1.

But instead of AAA appointing merits arbitrators, instead it appointed Anita Rae Shapiro as a "Process Arbitrator" to oversee the process of coordinating the individual demands. *Id.*, Dkt. No. 21-1, Ex. 13 at p. 378. Rather than facilitate the substantive arbitration process, however, the Process Arbitrator's appointment ground it to a halt. On October 27, 2022, she issued an Order requiring all Wells Fargo claimants, including Plaintiffs, to satisfy a series of specific heightened pleading requirements before AAA would process their claims. Dkt. No. 14, ¶¶ 119-120. These requirements included 1) each claimant's Wells Fargo account number for the account at issue, (2) facts establishing that a claimant had been enrolled in DCOS during the time period and (3) facts establishing that each claimant incurred overdraft fees in connection with transactions covered by Regulation E. *Id.* In addition to these factual allegations, the Process Arbitrator ordered MLG to "sign each Amended Claim as required by California Code of Civil Procedure 128.7." *Id.,* fn.44. These requirements were established for "all Claims submitted to [AAA]" after the Order was issued, and stayed Wells Fargo's requirement to pay arbitration fees until all Claimants satisfied these enhanced pleading requirements. *Id.,* ¶¶ 120-121.  Even those claims previously deemed appropriate for processing were halted by the Process Arbitrator's Order. *Id.*

Unsurprisingly, the arbitration process stalled out. Wells Fargo was released from the burden of paying the fees necessary to staff the arbitrations, though it had previously agreed to do so. And no progress at all could be made because the Process Arbitrator had ordered that all the arbitrations were stayed until all Claimants amended their demands to include evidentiary proof of Wells Fargo's wrongdoing. Dkt. No. 14, ¶ 119-120.

6

The result devastated Plaintiffs' and other Claimants' claims. First, they were denied the "quick," "easy," "streamlined" process they had been promised in the Arbitration Agreement, despite giving up material rights to obtain these supposed benefits. But, more importantly, Plaintiffs and the other Claimants needed documentation from Wells Fargo in order to meet the Process Arbitrator's pleading standard. For example, Claimants bringing Regulation E claims, for instance, needed access to their agreements and monthly statements to determine the fees Wells Fargo charged and the resulting damages. Dkt. No. 14, ¶ 122. While some Claimants had access to this information, most did not. *Id.* In the case of APSN overdraft fees, in particular, they can be substantiated only by analyzing transactional data solely in Wells Fargo's possession, because customers do not have access to the balance at the time of a transaction's authorization. It is not available on statements or online account records; the information is maintained only in transactional account data maintained by Wells Fargo and similar financial institutions.  While statements may provide evidence of a possible APSN transaction, the only way to definitively show such a transaction is through review of account transactional data which is in the sole possession and control of Wells Fargo.

The Process Arbitrator's Order resulted in a classic Catch-22. Many Claimants, including Plaintiffs, have had difficulty accessing their account statements and cannot access their transactional data, which is why they empowered counsel to obtain the information on their behalf. [4] McCune Decl., Ex. 2. But rather than facilitate the exchange of information, the Process

---

[4] Wells Fargo is legally obligated to provide all customers with their monthly statements and account data upon request. 12 U.S.C. 5534(c)(1) and 12 U.S.C. 5533(c). Claimants attempted to explain this to the Process Arbitrator but she said whether Wells Fargo was required to provide its consumers with their own account statements and data was discovery and should be left to the purview of the merits arbitrators. But this isn't discovery, which the law makes clear.  Bank customers do not have to be engaged in active litigation to obtain this information about their *own* accounts. Here, Plaintiffs and all Claimants in arbitration (as customers of Wells Fargo) provided the necessary authorizations through counsel to obtain their account information, but Wells Fargo has repeatedly refused to comply. See, e.g., Dkt. No. 21-1, Ex. 16. Not only does Wells Fargo's refusal to provide the statements and data violate the law, in this case, it denies Plaintiffs and those they intend to represent the right to pursue their claims given the Process Arbitrator's imposed pleading requirements. The statements contain the information necessary to substantiate

---

7

Arbitrator determined that whether Claimants should receive information about their accounts information should be decided by individual "merits" arbitrators. These arbitrators, however, would not be assigned until Claimants could detail the fees at issue—in turn, the very reason the information was necessary. Thousands of Claimants, including Plaintiffs, were caught in the middle of this crossfire, and as a result, the Process Arbitrator dismissed their claims, having effectively required Claimants to plead and prove their claims before their arbitrations could commence and without any information changing hands. This was not at all what Plaintiffs bargained for.

    Nor are Plaintiffs asserting merely theoretical claims. The CFPB recently singled out APSN transactions as a particularly egregious form of overdraft abuse, and Wells Fargo has already agreed in a consent order to repay a small percentage of fees generated through that practice.[5] But Wells Fargo has generated many millions more in revenue than accounted for by the consent decree, and the Process Arbitrator's Order not only immunizes Wells Fargo's past practices, it protects Wells Fargo against all future claims, giving Wells Fargo further leverage to engage in consumer abuses. If Wells Fargo isn't required to provide the Plaintiffs and other Claimants with basic account information that the law said must be provided upon request, but a Process Arbitrator requires that information to be pled up front, these Plaintiffs and those they intend to represent have been effectively left without a forum in which to bring their claims.

---

almost every alleged claim (with the exception of APSN claims which require transactional data to identify damage transactions, and which courts regularly require financial institutions to provide if the financial institutions refuses, although most comply willingly). Thus, by the Process Arbitrator refusing to require Wells Fargo to provide this information that was properly requested by each Plaintiff through authorizations issued through counsel, they could not successfully allege their claims to meet the Process Arbitrator's standard and thus could never been assigned a merits arbitrator to hear their claims. By denying Plaintiffs access to their statements and data, and by not requiring Wells Fargo to provide them (although legally required), these Plaintiffs and those they intend to represent have been denied their day in "court."

[5] *See* https://files.consumerfinance.gov/f/documents/cfpb_wells-fargo-na-2022_consent-order_2022-12.pdf (last visited January 8, 2023).

8

1    After the Process Arbitrator issued the October 2022 Order, several Claimants filed a

2 lawsuit in the Southern District of California seeking declaratory relief from the requirements of

3 the Arbitration Agreement. *See Mosley v. Wells Fargo*, No. 22-CV-01976-DMS-AGS, 2023 WL

4 3185790 (S.D.Cal. May 1, 2023), *aff'd*, No. 23-55478, 2024 WL 977674 (9th Cir. Mar. 7, 2024)

5 ("*Mosley* Litigation"). They argued that the October 2022 Order amounted to a violation of the

6 contract provision that each Claimant was entitled to an individual arbitration process free of

7 class or other collective procedures. The Plaintiffs in that case argued that based on the Process

8 Arbitrator's blanket rule that all individuals had to satisfy heightened pleading standards and her

9 delaying all cases until all Claimants satisfied those standards, Plaintiffs had not received the

10 promised individualized arbitration procedures and, thus, the arbitration agreement had been

11 breached. Plaintiffs also argued that they could bring claims for injunctive relief in court based on

12 the plain language of the contract, further arguing that the contract had not clearly delegated that

13 decision to an arbitrator.

14    After holding that the question of arbitrability of Plaintiffs' substantive declaratory relief

15 claims was a matter for the arbitrator, the Court turned to the reviewability of the October 2022

16 Order. It concluded that the order was "not an award on the merits but a procedural order that

17 addresses claim filing requirements." *Mosley,* 2023 WL 3185790, at *4 (S.D.Cal. May 1, 2023).

18 It further concluded that "questions of procedure relating to arbitration are not reviewable by

19 courts," noting that "the basic purpose of arbitration is the speedy disposition of disputes without

20 the expense and delay of extended court proceedings." *Id.* Accordingly, it held that an appeal

21 from an "interlocutory ruling" would frustrate that purpose. *Id.* Judge Sabraw then dismissed the

22 lawsuit. *Id.,* at *5. The plaintiffs appealed to the Ninth Circuit, which affirmed Judge Sabraw's

23 order, including dismissal. *Mosley*, No. 23-55478, 2024 WL 977674, at *3.

24 **E.    After the Mosley Litigation Was Dismissed, the Process Arbitrator Dismissed**

25    **Plaintiffs' Claims**

26    Emboldened by the Southern District's refusal to provide relief, Wells Fargo and the

27 Process Arbitrator continued to undermine Claimants and their rights to a substantive hearing. On

28 June 14, 2023, a month after Judge Sabraw dismissed the *Mosley* litigation, the Process Arbitrator

9

ordered all Claimants to comply with the October 27, 2022 Order's pleading requirements by August 14, 2023. Each Claimant was required to plead (1) the account number for the account at issue, (2) their enrollment in DCOS during the time period (even though, notably, it can be a violation of Regulation E to assess fees without enrollment), and (3) they had incurred wrongly-charged overdraft fees. Dkt. No. 21, Ex. 40. The Process Arbitrator's single concession to Claimants was that counsel could submit a single spreadsheet containing all the information instead of individually amending each claim. *Id.* The Process Arbitrator also extended the reach of her earlier Order to include Claimants for whom Wells Fargo had not paid administrative fees, and Claimants whom had served claims on Wells Fargo for overdraft-related reasons going forward. Dkt. No. 20, at 8. At that time, the Process Arbitrator argued that Claimants not in compliance with the October 27, 2022 Order would be precluded from presenting evidence on those matters that had not been pled.

In July 2023, Claimants submitted a motion to amend their previously filed demands, as well as to amend the October 27, 2022 and June 14, 2023 Orders, to include allegations regarding Wells Fargo's practices of charging APSN and representation fees. Dkt. No. 21, Ex. 41. To promote consistency with the proposed amendment, Claimants moved to amend the Process Arbitrator's order to eliminate the requirement that they specifically allege their DCOS enrollment, because it would no longer be a prerequisite for the asserted overdraft claims, particularly in the context of APSN and representation fees. *Id.*

While Claimants' motion to amend was pending, pursuant to the Process Arbitrator's October 27, 2022 and June 14, 2023 Orders (the "PA Orders"), Claimants' counsel submitted an MS-Excel spreadsheet workbook containing information about 2,597 Claimants. McCune Decl., ¶ 5; *see also* Dkt. No. 21, Exs. 45-46. The file contained four spreadsheets. The first spreadsheet included 208 claimants who had obtained the necessary information to confirm each of the Process Arbitrator's requirements for substantiating a Regulation E claim, including an affirmative opt-in, account number, and a qualifying transaction within the timeframe described in the June 14, 2023 Order. *Id.* The second spreadsheet included 1,418 Claimants who confirmed their account number, and at least one overdraft fee tied either to a violation of Regulation E or

another legal theory. *Id.* The third spreadsheet listed 966 Claimants who were unable to submit information about their accounts, including the monthly statements necessary to demonstrate that they had opt-in status and/or qualifying transactions under all theories. *Id.* MLG represented that it intended to continue working with those individuals to obtain the necessary information. The fourth spreadsheet included five claimants who voluntarily withdrew their claims. *Id.* A few weeks later, MLG submitted an additional spreadsheet detailing the same information for those Claimants with more recently-served demands. *Id.*

On January 10, 2024, the Process Arbitrator issued an Order addressing the status of Claimants' cases in light of the additional information MLG submitted on Claimants' behalf. Dkt. No. 21, Ex. 58. The Process Arbitrator ruled that Claimants who had submitted information on the "Order Complaint Cases" portion of the spreadsheet had complied with the pleading requirements and merits arbitrators would be appointed for their claims. The Process Arbitrator then dismissed all remaining claims, including those of Plaintiffs and other similarly-situated Claimants. *Id.*

**F.     Wells Fargo's History of Animus Against MLG**

Unfortunately, this dispute cannot be fully understood without addressing the long history of Wells Fargo's animus toward MLG, and its predecessor firm, McCune Wright Arevalo, LLP ("MWA"), an animus resulting from MLG's role in a series of litigations over overdraft fees that now span nearly two decades. In one such litigation, Judge William Alsup of the Northern District of California determined that Wells Fargo had breached its agreements with accountholders with regard to its overdraft fee practices, awarding the class approximately $200 million and issuing an injunction against Wells Fargo's further practices. MWA also played a significant role in multi-district litigation consolidated in the Southern District of Florida over the overdraft practices of many of the nation's largest banks, one of which was Wells Fargo. The result of Wells Fargo's animus toward MLG is that there are often two separate, unrelated, issues bound up in this ongoing dispute. One side of the litigation attempts to address the substantive disputes between Plaintiffs and those they seek to represent and Wells Fargo; because Wells Fargo has prevented Plaintiffs from using class procedures, resolving disputes on an individual

11

basis is both time-consuming and expensive on both sides. The other part of the litigation, however, is Wells Fargo's ongoing smear campaign against MLG, which it wages as revenge for MLG's role in previous litigations against it, as well as to distract from the substance of Plaintiffs' allegations.

Wells Fargo's smear campaign against MLG is alive and well in its motion, reflected in various passages, but none more so than recycling a non-issue regarding MLG's website, which arises only because of Wells Fargo's own questionable practices.  As Wells Fargo knows from previous disputes with both the arbitrator and the court, on June 30, 2022, an MLG (then, MWA) employee pushed through a website update inadvertently including some unreviewed, not-intended-for-publication draft webpages. While these draft pages were viewable for several hours by automatic scrapers like those employed by Wells Fargo's IT department, there was no existing link on the MWA website, or anywhere else, directing the public to these pages. McCune Decl., Ex. 3. Nor could these errantly-posted webpages be found by entering "Wells Fargo" in the MWA website's search engine. Nor were the draft pages live for long enough to register on Google searches. Thus, MWA remains unaware of any way in which the public would have known about the draft pages, much less reviewed or acted on them. *Id*.

MWA saved its analytic reports related to this information, thereby preserving it for the Court. These reports indicate that the web page in question was viewed 27 times, and of those 27 views, 22 were unique. And many of these hits came from Virginia, where Wells Fargo's counsel is located. It is impossible to definitively track each of these viewings as Wells Fargo-related, but many of these viewings were immediate bounces, meaning that the viewer took no time on the page at all. All 27 views occurred on the same date time-stamped on the screen shot Wells Fargo submitted, suggesting that the webpage was discovered, then shared internally among Wells Fargo and its counsel.

Without any evidence that the public accessed these pages, MWA's investigation suggested that Wells Fargo must have discovered the draft page through a process called "web-crawling." Web-crawling is a colloquial term for engaging a specialist to access certain files that list the webpages published as part of the website. At the time, MLG monitored website use

12

through a program called Inspectlet, precisely for purposes of website security. After reviewing these sessions, MLG confirmed that the web-crawler could not have accessed the page without knowing the direct link and entering it into the browser. Furthermore, Wells Fargo's own screen capture demonstrates that the user did not navigate to the /wells-fargo-new-arbitrations/ webpage. Instead, the user entered the URL into the browser directly, something that only could have been done if the crawler had already discovered the hidden pages.[6]

## III.    LEGAL STANDARD

The Federal Arbitration Act (FAA) governs arbitration agreements. 9 U.S.C. § 2. The FAA affords parties the right to obtain a court order directing arbitration to proceed in the manner provided for in the agreement. *Id.* To decide a motion to compel arbitration, the court must determine in the first instance (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Boardman v. Pacific Seafood Grp.*, 822 F.3d 1011, 1017 (9th Cir. 2016).

## IV.    ARGUMENT

Plaintiffs oppose Wells Fargo's motion on two legal grounds. First and foremost, Wells Fargo has previously breached the Arbitration Agreement with Plaintiffs, thereby voiding that agreement. And second, whereas Judge Sabraw may have found the Process Arbitrator's earlier orders interlocutory, and therefore unreviewable, the Process Arbitrator's January 10, 2024 Order is indisputably a final and binding order, because it dismissed the claims of thousands of Wells Fargo Claimants, including those submitted by the Plaintiffs in this action. The Process Arbitrator's dismissal of these claims is, in fact, something of a non-sequitur, given the circumstances. Despite repeated assurances that the Process Arbitrator's jurisdiction was merely procedural, she issued an order substantively dismissing Plaintiffs' claims. At the very least,

---

[6] This was all presented to Judge Sabraw as part of the *Mosley* matter who, appropriately, ignored it, as this Court should do. None of Wells Fargo's petty (and dishonest) sniping has anything to do with the underlying substantive arguments regarding the Arbitration Agreement. At the end of the day, Wells Fargo's disputes should be with its customers, not with MLG, regardless of Wells Fargo's efforts to pretend otherwise.

Plaintiffs have now had their claims dismissed by a "final" order, necessitating this Court's intervention.

**A.      Plaintiffs' Claims Were Dismissed in a "Final and Binding" Order Resulting from a Collective Arbitration Process**

The first reason to deny the motion is that the process has now resulted in a final, binding order dismissing Plaintiffs' claims. *See Millmen Local 550, United Broth. Of Carpenters and Joiners of Am., AFL-CIO v. Wess Exterior Trim*, 828 F.2d 1373, 1375 (9th Cir. 1987). Wells Fargo, with no sense of irony, still argues that the January 10 Order dismissing thousands of individual claims is not "final and binding." (Def's MTC at 20-21.) Of course, Wells Fargo does little more than regurgitate the holdings of *Mosley I*. But *Mosley I* involved a different phase of the arbitration proceeding. In *Mosley I*, the Southern District refused to review the PA Order, finding it "procedural and not reviewable" rather than "final and binding." *Mosley v. Wells Fargo & Co.*, 2023 WL 3185790, at *4 (S.D.Cal. May 1, 2023). The Ninth Circuit went further, concluding "[n]o Claimant has yet won or lost a claim against Wells Fargo," therefore "an arbitration award has not been given." *Mosley v. Wells Fargo & Co.*, 2024 WL 977674, at *1 (9th Cir. Mar. 7, 2024). But this illusion is no longer sustainable.

In its January 10, 2024 Order, the Process Arbitrator determined that Claimants had "failed to comply with the pleading requirements" of her previous order. As a result, she dismissed those claims, stating that they could only be refiled if they were limited to "qualifying Regulation E transactions." Dkt. No. 21, Ex. 58.

Compelling Plaintiffs into arbitration when the arbitrator has already dismissed their claims in a collective process would not only be futile and absurd, especially given Wells Fargo refuses to comply with federal law requiring it to provide customers with their statements and data, but fundamentally contrary to principles of due process. If the sine qua non of arbitration remains a contractual agreement, at the very least, parties who give up valuable rights in return for access to the arbitration process should be able to access the arbitral forum without arbitrary, heightened pleading standards.

**B.**     **Wells Fargo Has Breached the Arbitration Agreement by Failing to Provide Plaintiffs with an Efficient, Individualized, or Neutral Dispute Resolution Forum**

Second, the Court should deny Wells Fargo's motion because the Arbitration Agreement has been breached and is, therefore, unenforceable against Plaintiffs. *See Michigan Mutual Ins. Co. v. Unigard Sec. Ins. Co.*, 44 F.3d 826, 832 (9th Cir. 1995) ("One remedy for a material breach of contract is to allow the non-breaching party to treat the contract as at an end, terminating any duty of counterperformance owed by the non-breaching party."). Because Wells Fargo has already breached the Arbitration Agreement, it would be manifestly unfair for the Court to enforce that agreement against the victims of the breach.

The Arbitration Agreement, found on page 35 of the Account Agreement, states that Wells Fargo intended to resolve disputes "as quickly and easily as possible." *Id.* at 97. To that end, the Arbitration Agreement requires that either party initiate arbitration to resolve disputes. Wells Fargo expressly defines "arbitration" as "an impartial third party will hear the dispute . . . and provide a decision." *Id.* The term "binding arbitration" is defined as the decision of the arbitrator is "final and enforceable." *Id.*

According to Wells Fargo, arbitration was beneficial to the parties because "it provides a legally binding decision in a more streamlined, cost-effective manner than a typical court case." *Id.* In order to bestow upon accountholders this "quick" and "easy" dispute resolution process, Wells Fargo required accountholders to "waive their right to a jury trial or a trial in front of a judge in a public court." *Id.* Moreover, accountholders were required to waive their rights "to join or consolidate disputes by or against others as a representative or member of a class, to act in any arbitration in the interests of the general public, or to act as a private attorney general." *Id.*

With regard to the rules of the arbitration, the parties agreed to administer each arbitration and the selection of arbitrators according to the AAA's Consumer Arbitration Rules (AAA Rules), and that to the extent there were differences between the AAA Rules and the Arbitration Agreement, the Arbitration Agreement would apply. *Id.* Wells Fargo stated that it would "pay any costs that are required to be paid by us under the arbitration administrator's rules and procedures, and subject to applicable law." *Id.*

15

The rules as Wells Fargo established them in the Arbitration Agreement have been breached in several ways, and Plaintiffs have gotten nowhere close to the benefit of their bargain. First, Plaintiffs did not receive the quick or streamlined process promised in the Arbitration Agreement. Second, Plaintiffs did not receive individualized dispute resolution process they were promised. Instead, what they got was a dispute in which Wells Fargo and AAA consolidated Plaintiffs' complaints with those of other Claimants and had all of those complaints dismissed by a single order of a Process Arbitrator lacking jurisdiction to make substantive determinations. Third, Plaintiffs did not receive the "impartial" procedure that Wells Fargo promised; instead, they got a process established by and for Wells Fargo, for the benefit of Wells Fargo and other large corporations who have made their own bed by demanding class action waivers from their consumers, but do not want to lie in that bed when they implement policies that violate consumer protection and other applicable laws that require individual arbitrations. And fourth, if Wells Fargo insists that the Process Arbitrator's Order is somehow not final and enforceable, then Wells Fargo has violated the provision of the Agreement stating that Plaintiff was entitled to a decision of the arbitrator that is "final and enforceable."

**C.      Plaintiffs Did Not Receive the "Quick" or "Streamlined" Arbitration the Account Agreement Promised**

Plaintiffs waived their rights to participate in class proceedings and a jury trial on the basis that they would receive the "quick" and "streamlined" individual arbitration Wells Fargo promised in the Arbitration Agreement. Plaintiffs served their claims to AAA between April-August 2022.[7] Four Plaintiffs—Charan, Molaris, Smythe, and Willshire—were assigned by AAA for Wells Fargo's payment of arbitration fees. McCune Decl., ¶ 6. Two—Penuela and Walton—never reached even that step. Each of Plaintiffs' claims was stayed by the October 27, 2022 Order requiring all Wells Fargo Claimants to amend their pleadings. No further action was taken on the matter until June 2023, when the Process Arbitrator amended the original October 27, 2022 Order

---

[7] Service dates are as follows: Andrew Penuela: April 13, 2022; Koushik Charan, June 9, 2022; Jill Molaris, May 6, 2022; Maria Smythe, June 9, 2022; Jessica Willshire, August 30, 2022; Daymond Walton, April 13, 2022.

Opposition to Defendants' Motion to Compel Arbitration
Case No. 4:24-Cv-00766-KAW

to cover all past and future Claimants with overdraft claims against Wells Fargo. Dkt. No. 21, Ex. 40. As noted in the June 14, 2023 Order, no stay had been issued while *Mosley* was appealed, but Claimants waited another several months in any event. And then, Claimants waited another five months until the Process Arbitration dismissed their claims in her follow-up order. *Id.*, Ex. 58. Far from being a quick or streamlined experience, Plaintiffs gave up the rights for a torturous, arbitrary process in which they did not even receive a substantive hearing before their claims were summarily dismissed. *Id.* This is not the reasonable result of an agreement to arbitrate.

**D.**   **Plaintiffs' Claims Were Dismissed Based on Collective Procedures Applied to Multiple Claims, Untethered from Individual Circumstances**

The district court held that it is "well-settled that questions of procedure relating to arbitration are not reviewable by courts." *Mosley*, 2023 WL 3185790, at *4. But the Process Arbitrator's dismissal of Plaintiffs' claims erases any potential distinction between procedure and substance. Whereas the question in *Mosley* was whether the *Mosley* plaintiffs' then-active claims had been subjected to collective action, the question here is whether Plaintiffs' claims were substantively dismissed through a collective process.

There has never been much doubt that they were. Particularly troublesome here is that the Process Arbitrator adopted class-wide procedures—the heightened pleading standard, the uniform timetable, and the insistence that Claimants match their individual claims to be substantively similar—that have always been associated with the powers exercised by a federal court, not an arbitrator. Whether or not the Process Arbitrator has followed AAA procedure is, in many respects, beyond the point. Neither AAA nor any individual process arbitrator can arrogate to itself class or collective procedures in arbitration, particularly when the governing contract explicitly prohibits them. *See Shivkov v. Artex Risk Solutions, Inc.,* 974 F.3d 1051, 1067-68 (9th Cir. 2020).

In the course of the *Mosley* litigation, the *Mosley* plaintiffs pointed to *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, where a AAA panel determined that an arbitration agreement had authorized class arbitration. *See* 559 U.S. 662, 668–70 (2010). Subsequently, a district court vacated that award because it was in "manifest disregard of the law." *Id.* at 669. The Second

Opposition to Defendants' Motion to Compel Arbitration
Case No. 4:24-Cv-00766-KAW

Circuit reversed, but the Supreme Court concluded that parties cannot be forced to class arbitration absent an express agreement, and that the courts could intervene. *Id.* at 670. It vacated the arbitration award, even though the imposition of class procedures is inarguably "procedural in nature," reasoning that an arbitrator imposing class or collective procedures does not presumptively reserve the power to impose, and thus has no ability to enforce, those procedures. *Id.* Both parties to an arbitration agreement have a substantive, enforceable contract right to bilateral arbitration.

According to Judge Sabraw, however, the federal courts could not interfere because the October 2022 PA Order was not a final and binding order. *Mosley*, 2023 WL 3185790, at *4. But now, the process has played out, and the Process Arbitrator has issued a final order dismissing Plaintiffs' claims for failure to adhere to the required pleading standard. Accordingly, Plaintiffs' claims have now been dismissed based on indisputably collective procedures. These collective procedures became the sole basis for dismissing Plaintiffs' claims, even though the Arbitration Agreement expressly prohibits such procedures.

To say that the Process Arbitrator's shift "from individual to class arbitration" constituted a "fundamental change … that sacrifices the principal advantage of arbitration" can hardly be disputed under these circumstances. *Lamps Plus, Inc. v. Varela*, 578 U.S. 176, 182 (2019). Not only have the Process Arbitrator's orders consistently borne the hallmarks of class arbitration procedures, but now those procedures have borne fruit in the form of thousands of claims being dismissed. For Plaintiffs and thousands of others, their claims were dismissed as a result of Wells Fargo constructing a collective procedure to rid itself of claims it did not want to arbitrate or litigate.

Indeed, it makes no difference at this point whether the Process Arbitrator's jurisdiction is limited to administrative matters, as she repeatedly claims in her orders, or whether she has gone beyond her mandate into substantive matters. The problem here is that Plaintiffs' claims have been resolved through a collective procedure when both sides agreed to individual, bilateral arbitrations.

18

To that end, even Wells Fargo has repeatedly stressed that the parties have not agreed to collective procedures that would lead to anything other individual, bilateral arbitrations. Dkt. No. 20 at 1 (noting that Plaintiffs' arbitrations are to be resolved "on an individual basis"). Of course, there are reasons to doubt Wells Fargo's sincerity, and one of those reasons is precisely what the *Mosley* plaintiffs pointed out at the time—Wells Fargo advocates for bilateral arbitration until it is strategically inconvenient to do so. Then, it takes advantage of circumstances when collective procedure has been used against its litigation opponents—its customers.

Indeed, Plaintiffs here never received a bilateral arbitration—rather than "resolv[ing] a single dispute between the parties to a single agreement," the Process Arbitrator "instead resolve[d] many disputes between . . . thousands of parties." *Stolt Nielsen*, 559 U.S. at 686. And while wholesale dismissal seems like it would at least be efficient, the process behind the dismissal was just as slow, just as costly, and just as procedurally complex than a class or collective procedure—if not more so.

Next, returning Plaintiffs to the arbitration is tantamount to denying them any forum in which to purse their claims against Wells Fargo. Each of the Process Arbitrator's Orders was part of a process that led to thousands of dismissals without any kind of individualized hearing at all.

The problem with Wells Fargo's position is straightforward: Plaintiffs' claims did not receive the individual, bilateral hearing they were promised. While the Southern District may have been hesitant to intervene before the process ran its course, now it has. The fundamental injustice done to Plaintiffs is now due a remedy.

**E.    Claimants Were Not Given the Neutral Arbitrator Promised in the Deposit Agreement**

Finally, Plaintiffs were promised that their claims would be heard in a neutral and fair forum by an impartial arbitrator. AAA has proven itself incapable of providing such a forum. Given AAA's background, there was always reason for skepticism: Its governing council is dominated by the very same law firms who represent the large corporations that use jury trial and class action waivers, as well as arbitration clauses to resolve disputes. Prominent among these supporters are AAA's self-proclaimed "Council of 80," including multiple law firms who

19

represent banks generally and Wells Fargo specifically, and whom have influenced AAA rules to benefit large corporations like Wells Fargo at the expense of consumers. *See* McCune Decl., Ex.4.

Given the close ties between AAA and the large law firms that represent Wells Fargo, Wells Fargo's representations that AAA is a neutral forum are misleading and false. On the one hand, Wells Fargo convinces consumers that AAA is a neutral forum for everyday consumers to have their claims resolved in an efficient and neutral manner. On the other hand, Wells Fargo uses its counsel—Mayer Brown LLP and others—to influence AAA rules, making it more difficult for consumers to arbitrate their claims. *Id.*, Ex. 5 (devising rules to inhibit arbitration of claims). The goal is not only to derail claims to arbitration, but also to deny consumers even the opportunity to be heard on their claims at all.

As alleged in the complaint, the facts reveal a disturbing web of intrigue between AAA, Wells Fargo, and other anti-consumer organizations. Dkt. No. 14, ¶ 111-113. At the center of the web is the national advocacy organization, the Chamber of Commerce. Not the small business combination of local mom-and-pop shops of yesteryear, the national Chamber of Commerce exists as a uniquely anti-consumer organization. In particular, the Chamber stringently opposes all forms of consumer litigation against businesses, but particularly targets consumer class actions as a procedural mechanism for resolving consumer claims.

Mass arbitrations such as this one raise thorny questions about how to resolve mass actions undertaken to resolve many small claims arising from uniform corporate policy. While the federal judiciary established Rule 23 to resolve such claims, banks and other large corporations have all opted themselves out of the system, leaving the question of what will replace it. While corporations such as Wells Fargo are opposed to class actions, they are also opposed to mass arbitration and, in fact, are opposed to providing any forum for the resolution of consumer claims.

To that end, behind-the-scenes collusion between the various players is merely Wells Fargo's way of rigging the game. Mayer Brown LLP not only represents Wells Fargo, it has repeatedly represented the Chamber of Commerce, banks, and other similar corporations to

Opposition to Defendants' Motion to Compel Arbitration
Case No. 4:24-Cv-00766-KAW

advocate that Courts must enforce arbitration clauses to bar class actions.[8]  And while Mayer Brown attorneys were attacking mass arbitration in public, they were also re-writing the rules behind the scenes to ensure that clients like Wells Fargo closed the door on consumer remedies. Wells Fargo and its allies specifically directed their changes at AAA, Wells Fargo's previously selected arbitration administrator.[9] Unsurprisingly, they demanded (and won) inclusion of all the collective rules now being employed to bedevil the Plaintiffs and their co-claimants, including the requirement for claimants to submit case proof information before being allowed to file a claim, the requirement for claimants to submit personal identifying information, and the use of an AAA-appointed "process arbitrator" to collectively resolve "procedural" matters before individual cases could reach a substantive arbitrator in the first place.

Sure enough, just as Wells Fargo and its allies began playing the music, AAA began singing its tune. The reason should be obvious. Not only do arbitration agreements eliminate a consumer's ability to litigate—they eliminate the consumer's choice of forum. Wells Fargo has made a hash of the premise of "bilateral" arbitration in any event, but one of the expressly unilateral decisions that Wells Fargo (and similar corporations make) is the choice of forum. As a result, AAA and other arbitration administrators have absolutely no interest in whether consumers can obtain a fair or neutral forum for their claims. Instead, AAA is wholly responsive to the corporation that pays its bills—similar to the few major bond rating agencies with the market credibility to rate mortgage bonds before the 2008 mortgage crisis. If AAA is not willing to do what Wells Fargo wants, Wells Fargo will take its business elsewhere.

So it was no surprise that when Wells Fargo told AAA what was wanted, AAA did it. In this and other cases, AAA began mysteriously appointing "process arbitrators" to so-called "mass arbitration" cases, sneaking collective procedures into what had been promised, even if cynically, to be a bilateral, individual resolution process.  In this case, the Process Arbitrator then followed Wells Fargo's playbook to the letter, requiring Claimants to submit proof of their claims before they could even be administered, and requiring them to submit personal identifying information

---

[8] *See* McCune Decl., Ex. 5.
[9] *Id. at*  56 – 57.

that Wells Fargo already has in its possession. Since AAA named the Process Arbitrator in 2022, it has since formalized these rules, assuming that federal courts, having washed their hands of these cases, will never bother to review how Wells Fargo, AAA, and their allies are making the sausage.

Of course, this scheme was relatively successful for quite a while. Wells Fargo was able to increase the expense and delay of resolving these claims, and when the *Mosley* plaintiffs sought refuge with a federal court, they were summarily dismissed on the premise that the Process Arbitrator's orders were supposedly "interlocutory" and not final. But then the dog caught the car. They rigged the game so well against consumers that the Process Arbitrator dismissed thousands of claims in one fell swoop, simply because consumers couldn't gather or produce—as part of a heightened pleading process—information that Wells Fargo not only already has, but also has the legal duty to produce to Claimants as a matter of right. If nothing else, Wells Fargo and AAA can no longer hide behind the pretext that there is some process still to play out.

The premise of arbitration is that it is a contractual choice but, of course, it isn't. The legal fiction masquerades for the fact that arbitration is foisted upon consumers as a cost of doing business.  But even if the courts have already given up that much oversight, it ought to be at least a minimum requirement that corporations provide a neutral forum that can resist—rather than invite—the thumb of a large corporation like Wells Fargo on the scales of its supposed justice. This is all the more so when part of Wells Fargo's arbitration pitch—again, as cynical as that pitch is in the first place—is that consumers can safely waive their rights to litigate because AAA is a neutral forum.

The rules of this arbitration were set by the parties' Arbitration Agreement, and those rules require individual, bilateral arbitrations for each consumer. And that's not just Plaintiffs' position; Wells Fargo still cynically hawks that position every chance it can, *knowing* that AAA will simply play along with the gag and *hoping* that the federal courts will just keep ignoring their outrageous, two-faced hypocrisy. This Court should put a stop to all of it and restore some semblance of justice to Plaintiffs' attempts to hold Wells Fargo accountable.

1

### V.    CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion to Compel Arbitration.

DATED: June 27, 2024                    Respectfully Submitted,

**McCUNE LAW GROUP, APC**

By:*/s/ Richard D. McCune*
Richard D. McCune
rdm@mccunewright.com
Steven A. Haskins
sah@mccunewright.com
Valerie L. Savran
vls@mccunewright.com
McCUNE LAW GROUP
McCune Wright Arevalo Vercoski
Kusel Weck Brandt, APC
3281 E. Guasti Road, Suite 100
Ontario, California 91761
Telephone:  (909) 557-1250
Facsimile:  (909) 557-1275

Emily J. Kirk *
ejk@mccunewright.com
McCUNE LAW GROUP
McCune Wright Arevalo Vercoski
Kusel Weck Brandt, APC
231 N. Edwardsville, Illinois 62025
Telephone: (618) 307-6116
Facsimile:  (909) 557-1275

*Attorneys for Plaintiffs and the Putative Class*

*Admitted Pro Hac Vice*

Opposition to Defendants' Motion to Compel Arbitration
Case No. 4:24-Cv-00766-KAW

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2024 I electronically filed the foregoing document entitled **OPPOSOTION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION** with the Clerk of this Court for the United States District Court, Northern District of California using the CM/ECF system and served a copy of the same upon al counsel of record via the Court's electronic filing system.

By:*/s/Richard D. McCune*
Richard D. McCune

Certificate Of Service
Case No. 4:24-Cv-00766-KAW